PEMBAUR *v.* CITY OF CINCINNATI ET AL.

No. 84–1160.   Argued December 2, 1985—Decided March 25, 1986

BRENNAN, J., delivered the opinion of the Court with respect to Parts I, II–A, and II–C, in which WHITE, MARSHALL, BLACKMUN, STEVENS, and

O'Connor (except for Part II–C), JJ., joined, and an opinion with respect to Part II–B, in which White, Marshall, and Blackmun, JJ., joined. White, J., filed a concurring opinion, *post*, p. 485. Stevens, J., *post*, p. 487, and O'Connor, J., *post*, p. 491, filed opinions concurring in part and concurring in the judgment. Powell, J., filed a dissenting opinion, in which Burger, C. J., and Rehnquist, J., joined, *post*, p. 492.

*Robert E. Manley* argued the cause for petitioner. With him on the briefs was *Andrew S. Lipton.*

*Roger E. Friedmann* argued the cause for respondents. With him on the brief was *Arthur M. Ney, Jr.**

Justice Brennan delivered the opinion of the Court, except as to Part II–B.

In *Monell* v. *New York City Dept. of Social Services,* 436 U. S. 658 (1978), the Court concluded that municipal liability under 42 U. S. C. § 1983 is limited to deprivations of federally protected rights caused by action taken "pursuant to official municipal policy of some nature . . . ." *Id.,* at 691. The question presented is whether, and in what circumstances, a decision by municipal policymakers on a single occasion may satisfy this requirement.

I

Bertold Pembaur is a licensed Ohio physician and the sole proprietor of the Rockdale Medical Center, located in the city of Cincinnati in Hamilton County. Most of Pembaur's patients are welfare recipients who rely on government assistance to pay for medical care. During the spring of 1977, Simon Leis, the Hamilton County Prosecutor, began investigating charges that Pembaur fraudulently had accepted payments from state welfare agencies for services not actually provided to patients. A grand jury was convened, and the case was assigned to Assistant Prosecutor William Whalen.

---

*\*Jack D. Novik, Burt Neuborne,* and *Bruce Campbell* filed a brief for the American Civil Liberties Union et al. as *amici curiae* urging reversal.

In April, the grand jury charged Pembaur in a six-count indictment.

During the investigation, the grand jury issued subpoenas for the appearance of two of Pembaur's employees. When these employees failed to appear as directed, the Prosecutor obtained capiases for their arrest and detention from the Court of Common Pleas of Hamilton County.[1]

On May 19, 1977, two Hamilton County Deputy Sheriffs attempted to serve the capiases at Pembaur's clinic. Although the reception area is open to the public, the rest of the clinic may be entered only through a door next to the receptionist's window. Upon arriving, the Deputy Sheriffs identified themselves to the receptionist and sought to pass through this door, which was apparently open. The receptionist blocked their way and asked them to wait for the doctor. When Pembaur appeared a moment later, he and the receptionist closed the door, which automatically locked from the inside, and wedged a piece of wood between it and the wall. Returning to the receptionist's window, the Deputy Sheriffs identified themselves to Pembaur, showed him the capiases and explained why they were there. Pembaur refused to let them enter, claiming that the police had no legal authority to be there and requesting that they leave. He told them that he had called the Cincinnati police, the local media, and his lawyer. The Deputy Sheriffs decided not to take further action until the Cincinnati police arrived.

Shortly thereafter, several Cincinnati police officers appeared. The Deputy Sheriffs explained the situation to them and asked that they speak to Pembaur. The Cincinnati police told Pembaur that the papers were lawful and that he should allow the Deputy Sheriffs to enter. When Pembaur refused, the Cincinnati police called for a superior officer. When he too failed to persuade Pembaur to open the door,

---

[1] A capias is a writ of attachment commanding a county official to bring a subpoenaed witness who has failed to appear before the court to testify and to answer for civil contempt. See Ohio Rev. Code Ann. § 2317.21 (1981).

the Deputy Sheriffs decided to call their supervisor for further instructions. Their supervisor told them to call Assistant Prosecutor Whalen and to follow his instructions. The Deputy Sheriffs then telephoned Whalen and informed him of the situation. Whalen conferred with County Prosecutor Leis, who told Whalen to instruct the Deputy Sheriffs to "go in and get [the witnesses]." Whalen in turn passed these instructions along to the Deputy Sheriffs.

After a final attempt to persuade Pembaur voluntarily to allow them to enter, the Deputy Sheriffs tried unsuccessfully to force the door. City police officers, who had been advised of the County Prosecutor's instructions to "go in and get" the witnesses, obtained an axe and chopped down the door. The Deputy Sheriffs then entered and searched the clinic. Two individuals who fit descriptions of the witnesses sought were detained, but turned out not to be the right persons.

After this incident, the Prosecutor obtained an additional indictment against Pembaur for obstructing police in the performance of an authorized act. Although acquitted of all other charges, Pembaur was convicted for this offense. The Ohio Court of Appeals reversed, reasoning that Pembaur was privileged under state law to exclude the deputies because the search of his office violated the Fourth Amendment. *State* v. *Pembaur*, No. C–790380 (Hamilton County Court of Appeals, Nov. 3, 1982). The Ohio Supreme Court reversed and reinstated the conviction. *State* v. *Pembaur*, 9 Ohio St. 3d 136, 459 N. E. 2d 217, cert. denied, 467 U. S. 1219 (1984). The Supreme Court held that the state-law privilege applied only to bad-faith conduct by law enforcement officials, and that, under the circumstances of this case, Pembaur was obliged to acquiesce to the search and seek redress later in a civil action for damages. 9 Ohio St. 3d, at 138, 459 N. E. 2d, at 219.

On April 20, 1981, Pembaur filed the present action in the United States District Court for the Southern District of Ohio against the city of Cincinnati, the County of Hamilton,

the Cincinnati Police Chief, the Hamilton County Sheriff, the members of the Hamilton Board of County Commissioners (in their official capacities only), Assistant Prosecutor Whalen, and nine city and county police officers.[2]  Pembaur sought damages under 42 U. S. C. § 1983, alleging that the county and city police had violated his rights under the Fourth and Fourteenth Amendments.  His theory was that, absent exigent circumstances, the Fourth Amendment prohibits police from searching an individual's home or business without a search warrant even to execute an arrest warrant for a third person.  We agreed with that proposition in *Steagald* v. *United States*, 451 U. S. 204 (1981), decided the day after Pembaur filed this lawsuit.  Pembaur sought $10 million in actual and $10 million in punitive damages, plus costs and attorney's fees.

Much of the testimony at the 4-day trial concerned the practices of the Hamilton County Police in serving capiases. Frank Webb, one of the Deputy Sheriffs present at the clinic on May 19, testified that he had previously served capiases on the property of third persons without a search warrant, but had never been required to use force to gain access.  Assistant Prosecutor Whalen was also unaware of a prior instance in which police had been denied access to a third person's property in serving a capias and had used force to gain entry.  Lincoln Stokes, the County Sheriff, testified that the Department had no written policy respecting the serving of capiases on the property of third persons and that the proper response in any given situation would depend upon the circumstances.  He too could not recall a specific instance in

---

[2] Hamilton County Prosecutor Leis was not made a defendant because counsel for petitioner believed that Leis was absolutely immune.  Tr., Mar. 14–Mar. 17, p. 267.  We express no view as to the correctness of this evaluation.  Cf. *Imbler* v. *Pachtman*, 424 U. S. 409, 430–431 (1976) (leaving open the question of a prosecutor's immunity when he acts "in the role of an administrator or investigative officer rather than that of an advocate").

which entrance had been denied and forcibly gained. Sheriff Stokes did testify, however, that it was the practice in his Department to refer questions to the County Prosecutor for instructions under appropriate circumstances and that "it was the proper thing to do" in this case.

The District Court awarded judgment to the defendants and dismissed the complaint in its entirety. The court agreed that the entry and search of Pembaur's clinic violated the Fourth Amendment under *Steagald, supra,* but held *Steagald* inapplicable since it was decided nearly four years after the incident occurred. Because it construed the law in the Sixth Circuit in 1977 to permit law enforcement officials to enter the premises of a third person to serve a capias, the District Court held that the individual municipal officials were all immune under *Harlow* v. *Fitzgerald,* 457 U. S. 800 (1982).

The claims against the county and the city were dismissed on the ground that the individual officers were not acting pursuant to the kind of "official policy" that is the predicate for municipal liability under *Monell.* With respect to Hamilton County, the court explained that, even assuming that the entry and search were pursuant to a governmental policy, "it was not a policy of Hamilton County *per se*" because "[t]he Hamilton County Board of County Commissioners, acting on behalf of the county, simply does not establish or control the policies of the Hamilton County Sheriff." With respect to the city of Cincinnati, the court found that "the only policy or custom followed . . . was that of aiding County Sheriff's Deputies in the performance of their duties." The court found that any participation by city police in the entry and search of the clinic resulted from decisions by individual officers as to the permissible scope of assistance they could provide, and not from a city policy to provide this particular kind of assistance.

On appeal, Pembaur challenged only the dismissal of his claims against Whalen, Hamilton County, and the city of Cin-

cinnati.   The Court of Appeals for the Sixth Circuit upheld the dismissal of Pembaur's claims against Whalen and Hamilton County, but reversed the dismissal of his claim against the city of Cincinnati on the ground that the District Court's findings concerning the policies followed by the Cincinnati police were clearly erroneous.   746 F. 2d 337 (1984).[3]

The Court of Appeals affirmed the District Court's dismissal of Pembaur's claim against Hamilton County, but on different grounds.   The court held that the County Board's lack of control over the Sheriff would not preclude county liability if "the nature and duties of the Sheriff are such that his acts may fairly be said to represent the county's official policy with respect to the specific subject matter."   *Id.*, at 340–341.   Based upon its examination of Ohio law, the Court of Appeals found it "clea[r]" that the Sheriff and the Prosecutor were both county officials authorized to establish "the official policy of Hamilton County" with respect to matters of law enforcement.   *Id.*, at 341.   Notwithstanding these conclusions, however, the court found that Pembaur's claim against the county had been properly dismissed:

> "We believe that Pembaur failed to prove the existence of a county policy in this case.   Pembaur claims that the deputy sheriffs acted pursuant to the policies of the Sheriff and Prosecutor by forcing entry into the medical center.   Pembaur has failed to establish, however, anything more than that, on this *one occasion*, the Prosecutor and the Sheriff decided to force entry into his office. . . . That single, discrete decision is insufficient,

---

[3] The court found that there was a city policy respecting the use of force in serving capiases as well as a policy of aiding county police.   It based this conclusion on the testimony of Cincinnati Chief of Police Myron Leistler, who stated that it was the policy of his Department to take whatever steps were necessary, including the forcing of doors, to serve an arrest document.   746 F. 2d, at 341–342; see also, Tr., Mar. 14–Mar. 17, pp. 43–45, 46–47.   The court remanded the case for a determination whether Pembaur's injury was incurred as a result of the execution of this policy. 746 F. 2d, at 342.

by itself, to establish that the Prosecutor, the Sheriff, or both were implementing a governmental policy." *Ibid.* (footnote omitted) (emphasis in original).

Pembaur petitioned for certiorari to review only the dismissal of his claim against Hamilton County. The decision of the Court of Appeals conflicts with holdings in several other Courts of Appeals,[4] and we granted the petition to resolve the conflict. 472 U. S. 1016 (1985). We reverse.

## II

## A

Our analysis must begin with the proposition that "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell* v. *New York City Dept. of Social Services*, 436 U. S., at 691.[5] As we read its opinion, the Court of Appeals held that a single decision to

---

[4] See, *e. g.*, *McKinley* v. *City of Eloy*, 705 F. 2d 1110, 1116–1117 (CA9 1983); *Berdin* v. *Duggan*, 701 F. 2d 909, 913–914 (CA11), cert. denied, 464 U. S. 893 (1983); *Van Ooteghem* v. *Gray*, 628 F. 2d 488, 494–495 (CA5 1980), cert. denied, 455 U. S. 909 (1982); *Quinn* v. *Syracuse Model Neighborhood Corp.*, 613 F. 2d 438, 448 (CA2 1980). See also *Sanders* v. *St. Louis County*, 724 F. 2d 665, 668 (CA8 1983) *(per curiam)* ("It may be that one act of a senior county official is enough to establish the liability of the county, if that official was in a position to establish policy and if that official himself directly violated another's constitutional rights"). But see *Losch* v. *Borough of Parkesburg, Pa.*, 736 F. 2d 903, 910–911 (CA3 1984) ("[E]ven if [the Police Chief] were the final authority with regard to police activities, . . . there is no regulation or evidence of any repeated action by [the chief] . . . that can transmute his actions in the Losch incident into a general Borough policy").

[5] There is no question in this case that petitioner suffered a constitutional deprivation. The Court of Appeals found, and respondent concedes, that the entry and search of petitioner's clinic violated the Fourth Amendment under *Steagald* v. *United States*, 451 U. S. 204 (1981). See 746 F. 2d, at 340, n. 1; Brief for Respondents 11. Respondent never challenged and has in fact also conceded that *Steagald* applies retroactively to this case. See Tr. of Oral Arg. 26–27. We decide this case in light of respondent's concessions.

take particular action, although made by municipal policy-makers, cannot establish the kind of "official policy" required by *Monell* as a predicate to municipal liability under § 1983.[6] The Court of Appeals reached this conclusion without referring to *Monell*—indeed, without any explanation at all. However, examination of the opinion in *Monell* clearly demonstrates that the Court of Appeals misinterpreted its holding.

*Monell* is a case about responsibility. In the first part of the opinion, we held that local government units could be made liable under § 1983 for deprivations of federal rights, overruling a contrary holding in *Monroe* v. *Pape*, 365 U. S. 167 (1961). In the second part of the opinion, we recognized a limitation on this liability and concluded that a municipality cannot be made liable by application of the doctrine of *respondeat superior*. See *Monell*, 436 U. S., at 691. In part, this conclusion rested upon the language of § 1983, which imposes liability only on a person who "subjects, or causes to be subjected," any individual to a deprivation of federal rights; we noted that this language "cannot easily be read to impose liability vicariously on government bodies solely on the basis of the existence of an employer-employee relationship with a tortfeasor." *Id.*, at 692. Primarily,

---

[6] The opinion below also can be read as holding that municipal liability cannot be imposed for a single incident of unconstitutional *conduct* by municipal employees whether or not that conduct is pursuant to municipal *policy*. Such a conclusion is unsupported by either the language or reasoning of *Monell*, or by any of our subsequent decisions. As we explained last Term in *Oklahoma City* v. *Tuttle*, 471 U. S. 808 (1985), once a municipal policy is established, "it requires only one application . . . to satisfy fully *Monell's* requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Id.*, at 822 (plurality opinion); see also, *id.*, at 831–832 (BRENNAN, J., concurring in part and concurring in judgment.). The only issue before us, then, is whether petitioner satisfied *Monell's* requirement that the tortious conduct be pursuant to "official municipal policy."

however, our conclusion rested upon the legislative history, which disclosed that, while Congress never questioned its power to impose civil liability on municipalities for their *own* illegal acts, Congress did doubt its constitutional power to impose such liability in order to oblige municipalities to control the conduct of *others*. *Id.*, at 665–683.[7] We found that, because of these doubts, Congress chose not to create such obligations in § 1983. Recognizing that this would be the effect of a federal law of *respondeat superior*, we concluded that § 1983 could not be interpreted to incorporate doctrines of vicarious liability. *Id.*, at 692–694, and n. 57.

The conclusion that tortious conduct, to be the basis for municipal liability under § 1983, must be pursuant to a municipality's "official policy" is contained in this discussion. The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsi-

---

[7] This legislative history is discussed at length in *Monell* and need only be summarized here. The distinction between imposing liability on municipalities for their own violations and imposing liability to force municipalities to prevent violations by others was made by Members of the House of Representatives who successfully opposed the "Sherman amendment" to the Civil Rights Act of 1871, 17 Stat. 13, the precursor of § 1983. The Sherman amendment sought to impose civil liability on municipalities for damage done to the person or property of its inhabitants by private persons "riotously and tumultuously assembled." Cong. Globe, 42d Cong., 1st Sess., 749 (1871) (quoted in *Monell*, 436 U. S., at 664). Opponents of the amendment argued that, in effect, it imposed an obligation on local governments to keep the peace, and that the Federal Government could not constitutionally require local governments to keep the peace if state law did not. This argument succeeded in blocking passage of the amendment. However, even the opponents of the Sherman amendment recognized Congress' power to impose civil liability on a local government already obligated to keep the peace by state law if that government failed to do so and thereby violated the Fourteenth Amendment. See *id.*, at 665–683.

ble.[8] *Monell* reasoned that recovery from a municipality is limited to acts that are, properly speaking, acts "of the municipality"—that is, acts which the municipality has officially sanctioned or ordered.

With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body—whether or not that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy. See, *e. g., Owen* v. *City of Independence*, 445 U. S. 622 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); *Newport* v. *Fact Concerts, Inc.*, 453 U. S. 247 (1981) (City Council canceled license permitting concert because of dispute over content of performance). But the power to establish policy is no more the exclusive province of the legislature at the local level than at the state or national level. *Monell*'s language makes clear that it expressly envisioned other officials "whose acts or edicts may fairly be said to represent official policy," *Monell, supra,* at 694, and whose decisions therefore may give rise to municipal liability under § 1983.

Indeed, any other conclusion would be inconsistent with the principles underlying § 1983. To be sure, "official policy" often refers to formal rules or understandings—often but not always committed to writing—that are intended to, and do, establish fixed plans of action to be followed under similar cir-

---

[8] Thus, our statement of the conclusion juxtaposes the policy requirement with imposing liability on the basis of *respondeat superior:*

"We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy . . . , whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.,* at 694.

cumstances consistently and over time. That was the case in *Monell* itself, which involved a written rule requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary. However, as in *Owen* and *Newport*, a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government "policy" as that term is commonly understood.[9] More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly. To deny compensation to the victim would therefore be contrary to the fundamental purpose of § 1983.

## B

Having said this much, we hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. Municipal liability attaches only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered.[10] The fact that a particular official—even a policy-

[9] While the dictionary is not the source definitively to resolve legal questions, we note that this description of "policy" is consistent with the word's ordinary definition. For example, Webster's defines the word as "a specific decision or set of decisions designed to carry out such a chosen course of action." Webster's Third New International Dictionary 1754 (1981). Similarly, the Oxford English Dictionary defines "policy" as "[a] course of action adopted and pursued by a government, party, ruler, statesman, etc.; any course of action adopted as advantageous or expedient." VII Oxford English Dictionary 1071 (1933). See also, Webster's New Twentieth Century Dictionary 1392 (2d ed. 1979) ("any governing principle, plan, or course of action"); Random House Dictionary 1113 (1966) ("a course of action adopted and pursued by a government, ruler, political party, etc.").

[10] Section 1983 also refers to deprivations under color of a state "custom or usage," and the Court in *Monell* noted accordingly that "local govern-

making official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. See, *e. g.*, *Oklahoma City* v. *Tuttle*, 471 U. S., at 822–824.[11] The offi-

---

ments, like every other § 1983 'person,' . . . may be sued for constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decisionmaking channels." 436 U. S., at 690–691. A § 1983 plaintiff thus may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a state "custom or usage." Because there is no allegation that the action challenged here was pursuant to a local "custom," this aspect of *Monell* is not at issue in this case.

[11] Respondent argues that the holding in *Tuttle* is far broader than this. It relies on the statement near the end of JUSTICE REHNQUIST's plurality opinion that "[p]roof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell* unless proof of the incident includes proof that it was caused by an *existing*, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." 471 U. S., at 823–824 (emphasis added). Respondent contends that a policy cannot be said to be "existing" unless similar action has been taken in the past.

This reading of the *Tuttle* plurality is strained, and places far too much weight on a single word. The plaintiff in *Tuttle* alleged that a police officer's use of excessive force deprived her decedent of life without due process of law. The plaintiff proved only a single instance of unconstitutional action by a nonpolicymaking employee of the city. She argued that the city had "caused" the constitutional deprivation by adopting a "policy" of inadequate training. The trial judge instructed the jury that a single, unusually excessive use of force may warrant an inference that it was attributable to grossly inadequate training, and that the municipality could be held liable on this basis. We reversed the judgment against the city. Although there was no opinion for the Court on this question, both the plurality and the opinion concurring in the judgment found plaintiff's submission inadequate because she failed to establish that the unconstitutional act was taken *pursuant to* a municipal policy rather than simply resulting from such a policy in a "but for" sense. *Id.*, at 822–824 (plurality opinion), 829–830 (BRENNAN, J., concurring in part and concurring in judgment). That conclusion is entirely consistent with our holding today that the policy which ordered or authorized an unconstitutional act can be established by a single decision by proper municipal policymakers.

cial must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.[12]   Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law.   However, like other governmental entities, municipalities often spread policymaking authority among various officers and official bodies.   As a result, particular officers may have authority to establish binding county policy respecting particular matters and to adjust that policy for the county in changing circumstances.   To hold a municipality liable for actions ordered by such officers exercising their policymaking authority is no more an application of the theory of *respondeat superior* than was holding the municipalities liable for the decisions of the City Councils in *Owen* and *Newport*.   In each case municipal liability attached to a single decision to take unlawful action made by municipal policymakers.   We hold that municipal liability under § 1983 attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in ques-

---

[12] Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy.   If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff *is* the official policymaker, *would* give rise to municipal liability.   Instead, if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.   This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board.   However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions *would* represent county policy and could give rise to municipal liability.

tion. See *Tuttle, supra,* at 823 ("'policy' generally implies a course of action consciously chosen from among various alternatives").

## C

Applying this standard to the case before us, we have little difficulty concluding that the Court of Appeals erred in dismissing petitioner's claim against the county. The Deputy Sheriffs who attempted to serve the capiases at petitioner's clinic found themselves in a difficult situation. Unsure of the proper course of action to follow, they sought instructions from their supervisors. The instructions they received were to follow the orders of the County Prosecutor. The Prosecutor made a considered decision based on his understanding of the law and commanded the officers forcibly to enter petitioner's clinic. That decision directly caused the violation of petitioner's Fourth Amendment rights.

Respondent argues that the County Prosecutor lacked authority to establish municipal policy respecting law enforcement practices because only the County Sheriff may establish policy respecting such practices. Respondent suggests that the County Prosecutor was merely rendering "legal advice" when he ordered the Deputy Sheriffs to "go in and get" the witnesses. Consequently, the argument concludes, the action of the individual Deputy Sheriffs in following this advice and forcibly entering petitioner's clinic was not pursuant to a properly established municipal policy.

We might be inclined to agree with respondent if we thought that the Prosecutor had only rendered "legal advice." However, the Court of Appeals concluded, based upon its examination of Ohio law, that both the County Sheriff and the County Prosecutor could establish county policy under appropriate circumstances, a conclusion that we do not question here.[18] Ohio Rev. Code Ann. § 309.09(A) (1979)

---

[18] We generally accord great deference to the interpretation and application of state law by the courts of appeals. *United States* v. *S.A. Empresa de Viacao Aerea Rio Grandense,* 467 U. S. 797, 815, n. 12 (1984); *Brockett*

provides that county officers may "require . . . instructions from [the County Prosecutor] in matters connected with their official duties." Pursuant to standard office procedure, the Sheriff's Office referred this matter to the Prosecutor and then followed his instructions. The Sheriff testified that his Department followed this practice under appropriate circumstances and that it was "the proper thing to do" in this case. We decline to accept respondent's invitation to overlook this delegation of authority by disingenuously labeling the Prosecutor's clear command mere "legal advice." In ordering the Deputy Sheriffs to enter petitioner's clinic the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under § 1983.

The decision of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE WHITE, concurring.

The forcible entry made in this case was not then illegal under federal, state, or local law. The city of Cincinnati frankly conceded that forcible entry of third-party property to effect otherwise valid arrests was standard operating procedure. There is no reason to believe that respondent county would abjure using lawful means to execute the capiases issued in this case or had limited the authority of its officers to use force in executing capiases. Further, the county officials who had the authority to approve or disapprove such entries opted for the forceful entry, a choice that was later held to be inconsistent with the Fourth Amendment. Vesting discretion in its officers to use force and its use in this case sufficiently manifested county policy to warrant reversal of the judgment below.

v. *Spokane Arcades, Inc.*, 472 U. S. 491, 499–500 (1985) (citing cases); see also *Bishop* v. *Wood*, 426 U. S. 341, 345–347 (1976).

This does not mean that every act of municipal officers with final authority to effect or authorize arrests and searches represents the policy of the municipality. It would be different if *Steagald* v. *United States*, 451 U. S. 204 (1981), had been decided when the events at issue here occurred, if the State Constitution or statutes had forbidden forceful entries without a warrant, or if there had been a municipal ordinance to this effect. Local law enforcement officers are expected to obey the law and ordinarily swear to do so when they take office. Where the controlling law places limits on their authority, they cannot be said to have the authority to make contrary policy. Had the Sheriff or Prosecutor in this case failed to follow an existing warrant requirement, it would be absurd to say that he was nevertheless executing county policy in authorizing the forceful entry in this case and even stranger to say that the county would be liable if the Sheriff had secured a warrant and it turned out that he and the Magistrate had mistakenly thought there was probable cause for the warrant. If deliberate or mistaken acts like this, admittedly contrary to local law, expose the county to liability, it must be on the basis of *respondeat superior* and not because the officers' acts represent local policy.

Such results would not conform to *Monell* and the cases following it. I do not understand the Court to hold otherwise in stating that municipal liability attaches where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Ante*, at 483–484. A sheriff, for example, is not the final policymaker with respect to the probable-cause requirement for a valid arrest. He has no alternative but to act in accordance with the established standard; and his deliberate or mistaken departure from the controlling law of arrest would not represent municipal policy.

In this case, however, the Sheriff and the Prosecutor chose a course that was not forbidden by any applicable law, a

choice that they then had the authority to make. This was county policy, and it was no less so at the time because a later decision of this Court declared unwarranted forceful entry into third-party premises to be violation of the Fourth Amendment.* Hence, I join the Court's opinion and judgment.

JUSTICE STEVENS, concurring in part and concurring in the judgment.

This is not a hard case. If there is any difficulty, it arises from the problem of obtaining a consensus on the meaning of the word "policy" — a word that does not appear in the text of 42 U. S. C. § 1983, the statutory provision that we are supposed to be construing. The difficulty is thus a consequence of this Court's lawmaking efforts rather than the work of the Congress of the United States.[1]

With respect to both the merits of the constitutional claim and the county's liability for the unconstitutional activities of its agents performed in the course of their official duties, there can be no doubt that the Congress that enacted the Ku Klux Act in 1871 intended the statute to authorize a recovery in a case of this kind. When police officers chopped down the door to petitioner's premises in order to serve capiases on two witnesses, they violated petitioner's constitutional rights. *Steagald* v. *United States*, 451 U. S. 204 (1981),

---

*The county has not challenged the retroactivity of *Steagald* v. *United States*, 451 U. S. 204 (1981), and I do not address that issue.

[1] See *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 841 (1985) (STEVENS, J., dissenting) ("While the Court purports to answer a question of statutory construction . . . its opinion actually provides us with an interpretation of the word 'policy' as it is used in Part II of the opinion in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 690–695 (1978). The word 'policy' does not appear in the text of § 1983, but it provides the theme for today's decision"). It may be significant that the issue has apparently become, not the purpose and scope of 42 U. S. C. § 1983, but the nature of the liability "envisioned" by this Court "in *Monell*." *Post*, at 491 (O'CONNOR, J., concurring in part and concurring in judgment); *post*, at 499 (POWELL, J., dissenting).

makes it perfectly clear that forcible entry to a third party's premises to execute an arrest warrant is unconstitutional if the entry is without a search warrant and in the absence of consent or exigent circumstances.[2] In my view, it is not at all surprising that respondents have "conceded" the retroactivity of *Steagald.* For *Steagald* plainly presented its holding as compelled by, and presaged in, well-established precedent.[3]

---

[2] Indeed, it can be argued that the justification for a forcible entry to serve a capias, as in this case, is even weaker than the justification for a forcible entry to execute an arrest warrant, as in *Steagald.* Since the Sixth Circuit in this action, 746 F. 2d 337 (1984), and the Ohio Supreme Court in reviewing petitioner's conviction, *State* v. *Pembaur,* 9 Ohio St. 3d 136, 459 N. E. 2d 217, cert. denied, 467 U. S. 1219 (1984), did not distinguish between the two situations, however, and since the forcible entry was unconstitutional under either conception, it is unnecessary to rest on that possible difference.

[3] See 451 U. S., at 211 ("Except in [cases of consent or exigent circumstances], we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant"); *id.,* at 213–214 ("In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant. . . . We see no reason to depart from this settled course when the search of a home is for a person rather than an object"); *id.,* at 216 ("Since warrantless searches of a home are impermissible absent consent or exigent circumstances, we conclude that the instant search violated the Fourth Amendment"); *id.,* at 219 ("[I]f anything, the little guidance that can be gleaned from common-law authorities undercuts the Government's position. The language of *Semayne's Case,* [5 Co. Rep. 91a, 77 Eng. Rep. 194 (K. B. 1603)], . . . suggests that although the subject of an arrest warrant could not find sanctuary in the home of the third party, the home remained a 'castle or privilege' for its residents. Similarly several [common-law] commentators suggested that a search warrant, rather than an arrest warrant, was necessary to fully insulate a constable from an action for trespass brought by a party whose home was searched"); *id.,* at 220 ("[T]he history of the Fourth Amendment strongly suggests that its Framers would not have sanctioned the instant search").

The fact that the Sixth Circuit and two other Circuits had reached a contrary conclusion does not transform *Steagald* into a nonretroactive opinion. This Court has never suggested that resolution of a split in the Circuits

Similarly, if we view the question of municipal liability from the perspective of the Legislature that enacted the Ku Klux Act of 1871, the answer is clear. The legislative history indicating that Congress did not intend to impose civil liability on municipalities for the conduct of third parties, *ante*, at 478–479, and n. 7, merely confirms the view that it did intend to impose liability for the governments' own illegal acts—including those acts performed by their agents in the course of their employment. In other words, as I explained in my dissent in *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 835–840 (1985), both the broad remedial purpose of the statute and the fact that it embodied contemporaneous common-law doctrine, including *respondeat superior*, require a conclusion that Congress intended that a governmental entity be liable for the constitutional deprivations committed by its agents in the course of their duties.[4]

---

somehow means that a holding is presumptively nonretroactive in the Circuits that have disagreed with the Court's ultimate conclusion. Furthermore, the suggestion that there is a more compelling need for nonretroactivity in a civil context than in a criminal context, *post*, at 492–496 (POWELL, J., dissenting), ignores the fact that, in a civil context, there is not the societal cost of reversing convictions. Cf. *Johnson* v. *New Jersey*, 384 U. S. 719, 731 (1966) ("[R]etroactive application of *Escobedo* [v. *Illinois*, 378 U. S. 478 (1964),] and *Miranda* [v. *Arizona*, 384 U. S. 436 (1966),] would seriously disrupt the administration of our criminal laws. It would require the retrial or release of numerous prisoners found guilty by trustworthy evidence in conformity with previously announced constitutional standards"). Additionally, *Payton* v. *New York*, 445 U. S. 573 (1980), which *Steagald* cites and discusses, has, of course, been held retroactive in the only context in which the Court has considered the issue. See *United States* v. *Johnson*, 457 U. S. 537 (1982).

[4] Several commentators have concluded that the dicta in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978), regarding *respondeat superior* misreads the legislative history of § 1983. See, *e. g.*, Blum, From *Monroe* to *Monell*: Defining the Scope of Municipal Liability in Federal Courts, 51 Temp. L.Q. 409, 413, n. 15 (1978) ("The interpretation adopted by the Court with respect to the rejection of vicarious liability under § 1983 had been espoused prior to *Monell* by one author who drew a distinction between 'political' § 1983 cases, in which a city itself causes the constitutional violation, and 'constitutional tort' § 1983 cases, in which an

Finally, in construing the scope of § 1983, the Court has sometimes referred to "considerations of public policy."[5] To the extent that such "policy" concerns are relevant, they also support a finding of county liability. A contrary construction would produce a most anomalous result. The primary responsibility for protecting the constitutional rights of the residents of Hamilton County from the officers of Hamilton County should rest on the shoulders of the county itself, rather than on the several agents who were trying to perform their jobs. Although I recognize that the county may provide insurance protection for its agents, I believe that the primary party against whom the judgment should run is the county itself. The county has the resources and the authority that can best avoid future constitutional violations and provide a fair remedy for those that have occurred in the past. Thus, even if "public policy" concerns should inform the construction of § 1983, those considerations, like the statute's remedial purpose and common-law background, support

attempt is made to impose vicarious liability on the city for the misconduct of its employees. . . . Although this view of § 1983 may represent a sensitive response to the fiscal plight of municipal corporations today, it should not be acknowledged as a legitimate interpretation of congressional intent in 1871"); Note, Section 1983 Municipal Liability and the Doctrine of Respondeat Superior, 46 U. Chi. L. Rev. 935, 936 (1979) ("[T]he purposes and legislative history of the provision demand a scheme of respondeat superior liability"); Note, Monell v. Department of Social Services: One Step Forward and a Half Step Back for Municipal Liability Under Section 1983, 7 Hofstra L. Rev. 893, 921 (1979) ("Analysis of the legislative history of section 1983 does not indicate that Congress intended to exclude respondeat superior from the act. The language of the statute similarly offers no such proof. Since both were relied on by the Court in Monell, the dicta in that decision is, at best, poorly reasoned authority for the proposition that a municipality is not liable for the unauthorized acts of its employees"); Comment, Municipal Liability under Section 1983 for Civil Rights Violations After Monell, 64 Iowa L. Rev. 1032, 1045 (1979) ("The Court's [respondeat superior] limitation . . . is not justified by the legislative history of section 1983 or by policy considerations").

[5] Newport v. Fact Concerts, Inc., 453 U. S. 247, 266 (1981); Owen v. City of Independence, 445 U. S. 622, 650 (1980).

a conclusion of county liability for the unconstitutional, axe-swinging entry in this case.

Because I believe that Parts I, II–A, and II–C are consistent with the purpose and policy of § 1983, as well as with our precedents, I join those Parts of the Court's opinion[6] and concur in the judgment.

JUSTICE O'CONNOR, concurring in part and concurring in the judgment.

For the reasons stated by JUSTICE WHITE, I agree that the municipal officers here were acting as policymakers within the meaning of *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658 (1978). As the city of Cincinnati freely conceded, forcible entry of third-party property to effect an arrest was standard operating procedure in May 1977. Given that this procedure was consistent with federal, state, and local law at the time the case arose, it seems fair to infer that respondent county's policy was no different. Moreover, under state law as definitively construed by the Court of Appeals, the county officials who opted for the forcible entry "had the authority to approve or disapprove such entries." *Ante*, at 485 (WHITE J., concurring). Given this combination of circumstances, I agree with JUSTICE WHITE that the decision to break down the door "sufficiently manifested county policy to warrant reversal of the judgment below." *Ibid.* Because, however, I believe that the reasoning of the majority goes beyond that necessary to decide the case, and because I fear that the standard the majority articulates may be misread to expose municipalities to liability beyond that envisioned by the Court in *Monell*, I join only Parts I and II–A of the Court's opinion and the judgment.

---

[6] The reasons for my not joining Parts II and IV of *Monell*, 436 U. S. at 714 (STEVENS, J., concurring in part), are also applicable to my decision not to join Part II–B of this opinion.

JUSTICE POWELL, with whom THE CHIEF JUSTICE and JUSTICE REHNQUIST join, dissenting.

The Court today holds Hamilton County liable for the forcible entry in May 1977 by Deputy Sheriffs into petitioner's office. The entry and subsequent search were pursuant to capiases for third parties—petitioner's employees—who had failed to answer a summons to appear as witnesses before a grand jury investigating petitioner. When petitioner refused to allow the Sheriffs to enter, one of them, at the request of his supervisor, called the office of the County Prosecutor for instructions. The Assistant County Prosecutor received the call, and apparently was in doubt as to what advice to give. He referred the question to the County Prosecutor, who advised the Deputy Sheriffs to "go in and get them [the witnesses]" pursuant to the capiases.

This five-word response to a single question over the phone is now found by this Court to have created an official county policy for which Hamilton County is liable under § 1983. This holding is wrong for at least two reasons. First, the Prosecutor's response and the Deputies' subsequent actions did not violate any constitutional right that existed at the time of the forcible entry. Second, no official county policy could have been created solely by an offhand telephone response from a busy County Prosecutor.

I

Petitioner's allegation of a constitutional violation rests exclusively on *Steagald* v. *United States,* 451 U. S. 204 (1981), decided four years after the entry here. In *Steagald* we held that an officer may not search for the subject of an arrest warrant in a third party's home without first obtaining a search warrant, unless the search is consensual or justified by exigent circumstances. In 1977, the law in the Sixth Circuit was that a search warrant was not required in such situations if the police had an arrest warrant and reason to believe that the person to be arrested was within the home to be

searched. *United States* v. *McKinney*, 379 F. 2d 259, 262–263 (1967). That view was shared by at least two other Circuits. See *United States* v. *Gaultney*, 606 F. 2d 540, 544–545 (CA5 1979); *United States* v. *Harper*, 550 F. 2d 610, 612–614 (CA10), cert. denied, 434 U. S. 837 (1977). Another Circuit had favored that view in dicta. See *United States* v. *Manley*, 632 F. 2d 978, 983 (CA2 1980). Thus, under the governing law in the applicable Circuit, uncontradicted by any opinion of this Court, the entry into petitioner's office pursuant to an arrest warrant was not a violation of petitioner's Fourth Amendment rights.

The only way to transform this search—legitimate at the time—into a constitutional violation is to apply *Steagald* retroactively. This would not be a startling proposition if all that petitioner sought was retroactive application of a new rule of criminal law to a direct appeal from his criminal conviction.[1] But petitioner seeks something very different— retroactive application of the new rule of criminal law announced in *Steagald* to his subsequent civil lawsuit. Even if one accepts the proposition that a new rule of criminal law should be applied retroactively to create a basis for civil liability under § 1983,[2] existing principles of retroactivity for

---

[1] In fact, on direct appeal from his criminal conviction, petitioner did enjoy retroactive application of the rule in *Steagald*, although it did not entitle him to reversal of his conviction. *State* v. *Pembaur*, 9 Ohio St. 3d 136, 459 N. E. 2d 217 (1984). While the Ohio Supreme Court did not specifically address the retroactivity issue, it did discuss the applicability of *Steagald* to petitioner's criminal appeal. 9 Ohio St. 3d, at 137–138, 459 N. E. 2d, at 218–219. The court reasoned, however, that because no "substantive" offense was involved, but only a conviction for obstructing the police, petitioner could not rely on the unconstitutionality of the search as a defense. *Id.*, at 138, 459 N. E. 2d, at 219.

[2] If new criminal rules are so applied, it is possible that a person could obtain the benefit of retroactive application of a new criminal rule to his civil § 1983 case, even though he could not use the new rule to attack his conviction collaterally. A prisoner literally could be forced to remain in prison while collecting his civil damages award. In *Shea* v. *Louisiana*, 470 U. S. 51 (1985), the Court created a distinction between retroactivity on

civil cases show that *Steagald* should not be applied retroactively to this action.

The leading case explaining the framework of analysis for civil retroactivity is *Chevron Oil Co.* v. *Huson*, 404 U. S. 97 (1971). Under *Chevron*, a court must assess: (i) whether the new decision "establish[ed] a new principle of law . . . by overruling clear past precedent . . . or by deciding an issue of first impression whose resolution was not clearly foreshadowed," *id.*, at 106; (ii) "the prior history of the rule in question, its purpose and effect, and whether retrospective operation will further or retard its operation," *id.*, at 107; and (iii) the respective inequities of retroactive or nonretroactive application, *ibid.*

When viewed in light of these factors, retroactive application of *Steagald* is not justified. First, *Steagald* overruled past Courts of Appeals precedent, and the decision had not been foreshadowed in opinions of this Court. The governing law in three Federal Circuits permitted searches of third parties' homes pursuant to an arrest warrant, see *supra*, at 493, and earlier decisions of this Court arguably supported such searches.[3] Second, the "purpose" of *Steagald* was to clarify the application of the Fourth Amendment to such searches, not to provide for money damages. Finally, retro-

---

direct review of a conviction and on collateral attack of a conviction that has become final. On collateral attack the principles of *Solem* v. *Stumes*, 465 U. S. 638 (1984), apply, which make it less likely that a new rule would be applied retroactively. A key factor under *Stumes* is the extent of the reliance by law enforcement authorities on the old standards. *Id.*, at 643.

[3] In *Dalia* v. *United States*, 441 U. S. 238 (1979), the Court rejected the argument that a separate search warrant was required before police could enter a business office to install an eavesdropping device when officers already had a warrant authorizing the eavesdropping itself. The Court noted that "in executing a warrant the police may find it necessary to interfere with privacy rights not explicitly considered by the judge who issued the warrant." *Id.*, at 257. In *Payton* v. *New York*, 445 U. S. 573 (1980), the Court rejected the suggestion that a separate search warrant was required before police could execute an arrest warrant by entering the home of the subject of the warrant.

active application of *Steagald* in this context would produce substantial inequitable results by imposing liability on local government units for law enforcement practices that were legitimate at the time they were undertaken. See *Griffin* v. *Illinois*, 351 U. S. 12, 26 (1956) (Frankfurter, J., concurring in judgment) ("We should not indulge in the fiction that the law now announced has always been the law . . ."). Civil liability should not attach unless there was notice that a constitutional right was at risk. *Procunier* v. *Navarette*, 434 U. S. 555, 562 (1978).

We ought to be even more wary of applying new rules of Fourth Amendment law retroactively to civil cases than we are with new rules of civil law. The primary reason for imposing § 1983 liability on local government units is deterrence, so that if there is any doubt about the constitutionality of their actions, officials will "err on the side of protecting citizens' rights." *Owen* v. *City of Independence*, 445 U. S. 622, 652 (1980). But law enforcement officials, particularly prosecutors, are in a much different position with respect to deterrence than other local government officials. Cf. *Imbler* v. *Pachtman*, 424 U. S. 409, 425 (1976). Their affirmative duty to enforce the law vigorously often requires them to take actions that legitimately intrude on individual liberties, often acting "under serious constraints of time and even information." *Ibid.* While law enforcement officials, as much as any other official, ought to "err on the side of protecting citizens' rights" when they have legitimate doubts about the constitutionality of their actions, they should not be deterred from doing their duty to enforce the criminal law when they have no such doubts. In this case, for example, Sixth Circuit law expressly authorized the Prosecutor's decision. Because a court engages in the same balancing of interests in a Fourth Amendment case that is required, with much less deliberation, of law enforcement officials, they are justified in relying on the judgment of the applicable federal court. Under these circumstances, there was nothing that should

have caused the officials to "harbor doubts about the lawfulness of their intended actions," *Owen, supra,* at 652, and therefore nothing to deter.

Moreover, there is a significant cost to unwarranted deterrence of law enforcement officials. We recognized in *Imbler* a strong state interest in "vigorous and fearless" prosecution, and found that to be "essential to the proper functioning of the criminal justice system." 424 U. S., at 427–428. Those same general concerns apply to other law enforcement officials. Unwarranted deterrence has the undesirable effect of discouraging conduct that is essential to our justice system and protects the State's interest in public safety. In that sense, this case is different from *Owen.* It is no answer to say that some officials are entitled either to absolute or qualified immunity. It ignores reality to say that if petitioner is successful in his $20-million suit it will not have a chilling effect on law enforcement practices in Hamilton County.[4]

For these reasons, *Steagald* should not be applied retroactively. Consequently, petitioner has no constitutional violation of which to complain. I therefore would affirm the decision of the Court of Appeals.[5]

---

[4] JUSTICE STEVENS misunderstands the unique posture of this case. This is not a question of retroactivity of a new civil rule to civil cases versus retroactivity of a new criminal rule to criminal cases. The special concerns discussed in the text above arise in part out of the retroactive application of a new rule of criminal law to civil cases. I see little to be gained by comparing the societal costs of civil and criminal retroactivity, see concurring opinion of STEVENS, J., *ante,* at 488–489, n. 3, because they can be severe in either case. Today's opinion could result in even a nonnegligent mistake in judgment imposing heavy liability on units of local government, especially now in view of the skyrocketing cost—or unavailability—of liability insurance. See also *Malley* v. *Briggs, ante,* p. 335.

[5] The Court's only response to these concerns is to note that respondent has "never challenged and has in fact also conceded that *Steagald* applied retroactively to this case. . . . We decide this case in light of respondent's concessions." *Ante,* at 477, n. 5. The retroactivity issue, however, is central to this case. We need not reach the difficult federal issues in this case if the Court correctly resolved *Steagald*'s retroactivity.

## II

Even if *Steagald* is applied retroactively, petitioner has failed to demonstrate the existence of an official policy for which Hamilton County can be liable. The action said to have created policy here was nothing more than a brief response to a single question over the telephone. The Deputy Sheriffs sought instructions concerning a situation that had never occurred before, at least in the memory of the participants. *Ante*, at 474–475. That in itself, and the fact that the Assistant Prosecutor had to obtain advice from the County Prosecutor, strongly indicate that no prior policy had been formed. Petitioner therefore argues that the County Prosecutor's reaction *in this case* formed county policy. The sparse facts supporting petitioner's theory—adopted by the Court today—do not satisfy the requirement in *Monell* v. *New York City Dept. of Social Services*, 436 U. S. 658, 691 (1978), that local government liability under § 1983 be imposed only when the injury is caused by government policy.

### A

Under *Monell*, local government units may be liable only when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U. S., at 690. This case presents the opportunity to define further what was meant in *Monell* by "official policy." Proper resolution of the case calls for identification of the applicable principles for determining when policy is

Nor are we prevented from doing so by any actual concession of the respondent. See Tr. of Oral Arg. 26–27. JUSTICE WHITE does not address the retroactivity of *Steagald* on the ground that the county had not relied on this contention. In my view, although we need not address this retroactivity issue, there is no question as to our right to do so—especially in view of the unfairness of holding the respondent county liable for not anticipating *Steagald*. *Procunier* v. *Navarette*, 434 U. S. 555, 559, n. 6 (1978); *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation*, 402 U. S. 313, 320, n. 6 (1971).

created. The Court today does not do this, but instead focuses almost exclusively on the status of the decisionmaker. Its reasoning is circular: it contends that policy is what policymakers make, and policymakers are those who have authority to make policy.

The Court variously notes that if a decision "is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood," *ante*, at 481, and that "where action is directed by those who establish governmental policy, the municipality is equally responsible . . . ," *ibid.* Thus, the Court's test for determining the existence of policy focuses only on whether a decision was made "by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Ante*, at 483–484.

In my view, the question whether official policy—in any normal sense of the term—has been made in a particular case is not answered by explaining who has final authority to make policy. The question here is not *"could* the County Prosecutor make policy?" but rather, *"did* he make policy?" By focusing on the authority granted to the official under state law, the Court's test fails to answer the key federal question presented. The Court instead turns the question into one of state law. Under a test that focuses on the authority of the decisionmaker, the Court has only to look to state law for the resolution of this case. Here the Court of Appeals found that "both the County Sheriff and the County Prosecutor [had authority under Ohio law to] establish county policy under appropriate circumstances." *Ante*, at 484. Apparently that recitation of authority is all that is needed under the Court's test because no discussion is offered to demonstrate that the Sheriff or the Prosecutor actually used that authority to establish official county policy in this case.

Moreover, the Court's reasoning is inconsistent with *Monell*. Today's decision finds that policy is established because a policymaking official made a decision on the telephone that was within the scope of his authority. The Court ignores the fact that no business organization or governmental unit makes binding policy decisions so cavalierly. The Court provides no mechanism for distinguishing those acts or decisions that cannot fairly be construed to create official policy from the normal process of establishing an official policy that would be followed by a responsible public entity. Thus, the Court has adopted in part what it rejected in *Monell:* local government units are now subject to *respondeat superior* liability, at least with respect to a certain category of employees, *i. e.*, those with final authority to make policy. See *Monell*, 436 U. S., at 691; see also *Oklahoma City* v. *Tuttle*, 471 U. S. 808, 818 (1985) (rejecting theories akin to *respondeat superior*) (plurality opinion). The Court's reliance on the status of the employee carries the concept of "policy" far beyond what was envisioned in *Monell*.

B

In my view, proper resolution of the question whether official policy has been formed should focus on two factors: (i) the nature of the decision reached or the action taken, and (ii) the process by which the decision was reached or the action was taken.

Focusing on the nature of the decision distinguishes between policies and mere ad hoc decisions. Such a focus also reflects the fact that most policies embody a rule of general applicability. That is the tenor of the Court's statement in *Monell* that local government units are liable under § 1983 when the action that is alleged to be unconstitutional "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." 436 U. S., at 690. The clear implication is that policy is created when a rule is formed that applies to all simi-

lar situations — a "governing principle [or] plan." Webster's New Twentieth Century Dictionary 1392 (2d ed. 1979).[6] When a rule of general applicability has been approved, the government has taken a position for which it can be held responsible.[7]

Another factor indicating that policy has been formed is the process by which the decision at issue was reached. Formal procedures that involve, for example, voting by elected officials, prepared reports, extended deliberation, or official records indicate that the resulting decisions taken "may fairly be said to represent official policy," *Monell, supra,* at 694. *Owen* v. *City of Independence,* 445 U. S. 622 (1980), provides an example. The City Council met in a regularly scheduled meeting. One member of the Council made a motion to release to the press certain reports that cast an employee in a bad light. After deliberation, the Council passed the motion with no dissents and one abstention. *Id.,* at 627–629. Although this official action did not establish a rule of general applicability, it is clear that policy was formed because of the process by which the decision was reached.

Applying these factors to the instant case demonstrates that no official policy was formulated. Certainly, no rule of general applicability was adopted. The Court correctly

---

[6] The focus on a rule of general applicability does not mean that more than one instance of its application is required. The local government unit may be liable for the first application of a duly constituted unconstitutional policy.

[7] An example of official policy in the form of a rule of general applicability is *Newport* v. *Fact Concerts, Inc.,* 453 U. S. 247 (1981). While the Court in that case was not called on to define the scope of the word "policy," the complaint was based on a rule of general applicability. The city canceled a scheduled concert pursuant to its rule of not allowing rock concerts. Plaintiffs alleged that the general rule against rock concerts violated their First Amendment rights. Even if the cancellation was the first implementation of the rule, it was clear that the city had committed itself to a general position that would govern future cases.

notes that the Sheriff "testified that the Department had no written policy respecting the serving of capiases on the property of third persons and that the proper response in any given situation would depend upon the circumstances." *Ante*, at 474. Nor could he recall a specific instance in which entrance had been denied and forcibly gained. The Court's result today rests on the implicit conclusion that the Prosecutor's response—"go in and get them"—altered the prior case-by-case approach of the Department and formed a new rule to apply in all similar cases. Nothing about the Prosecutor's response to the inquiry over the phone, nor the circumstances surrounding the response, indicates that such a rule of general applicability was formed.[8]

Similarly, nothing about the way the decision was reached indicates that official policy was formed. The prosecutor, without time for thoughtful consideration or consultation, simply gave an off-the-cuff answer to a single question. There was no *process* at all. The Court's holding undercuts

---

[8] There is nothing in the record to support the inference relied on by JUSTICES WHITE and O'CONNOR. Nor has this Court ever held that because a policy has been adopted by one city or county we may *assume* that a similar policy has been adopted by neighboring cities or counties. After all, the city and county in this case are separate governmental entities.

Moreover, and again contrary to the views of my colleagues, this Court has never held—at least to my knowledge—that we may assume that simply because certain conduct is permitted by existing law, it must have been adopted as county policy. The undisputed facts in this case refute these *assumptions* by JUSTICES WHITE and O'CONNOR. Neither the Sheriffs who had been denied entry nor the Assistant County Prosecutor knew of any such policy. Otherwise, one of the Sheriffs would not have called the Prosecutor's office, and certainly the Assistant Prosecutor would not have thought it necessary to put the question to the Prosecutor. Nor did the Prosecutor, when asked, say that the county's policy was to force an entry when necessary to serve a valid arrest warrant. Rather, he simply said "go in and get them"—the sort of spontaneous reply that a busy official might make quite thoughtlessly. As noted above, the Sheriff testified that the proper response would depend on the circumstances.

the basic rationale of *Monell*, and unfairly increases the risk of liability on the level of government least able to bear it. I dissent.