830 F.2d 193
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Sherri Anna CLEMONS, Plaintiff-Appellant,
v.
Morris 'Coon' STRATTON, individually and in his official
capacity as Pike County Jailer; et al.,
Defendants-Appellees.
 No. 86-6037
 United States Court of Appeals, Sixth Circuit.
 October 2, 1987.
 
 Before RALPH B. GUY, Jr., and BOGGS, Circuit Judges, and SUHRHEINRICH, District Judge.*
 RALPH B. GUY, Jr., Circuit Judge.
 
 
 1
 Appellant, Sherri Clemons, initiated this civil rights action pursuant to 42 U.S.C. Sec. 1983 and 1988 as a result of a strip search to which she was subjected upon her arrest on a charge of harassment. The district court granted directed verdicts both at the close of Clemons' case and at the end of the trial which had the effect of dismissing all federal claims against all defendants and Clemons appealed. Because we disagree with the district judge's conclusion that no reasonable juror could have found in Clemons' favor, we reverse.
 
 I.
 
 2
 On April 5, 1982, at approximately 7:30 p.m., Clemons was arrested at her home pursuant to a warrant on the charge of harassment. As defined by the state statute, harassment is classified as a 'violation,' punishable only by a fine, and involving behavior wherein, with intent to harass, annoy or alarm another person, one:
 
 
 3
 (a) Strikes, shoves, kicks or otherwise subjects him to physical contact or attempts or threatens to do the same; or
 
 
 4
 (b) In a public place, makes an offensively coarse utterance, gesture or display, or addressed abusive language to any person present; or
 
 
 5
 (c) Follows a person in or about a public place or places; or
 
 
 6
 (d) Engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.
 
 
 7
 Ky. Rev. Stat. Ann. Sec. 525.070 (Baldwin 1984). Although Ky. Rev. Stat. Ann. Sec. 431.060(3) provides that harassment is punishable by a fine only, it is one of only six such violations for which an arrest warrant can be issued (Ky. Rev. Stat. Ann. Sec. 431.410) and is a crime for which one can be detained in jail prior to trial (Ky. Rev. Stat. Ann. Secs. 431.062; 431.015).
 
 
 8
 Clemons' husband was permitted to drive her to the jail, presumably because the couple was well-known in the community and Mr. Clemons had even held the position of deputy jailer during a prior administration. It is undisputed that Sherri Clemons was known to have no prior criminal record whatsoever.
 
 
 9
 Upon arrival at the jail, Clemons was booked and processed in the lobby area by two deputy jailers. The head jailer, Morris Stratton, had no authority to release Clemons absent an order from one of the local district or circuit judges. Due to the late hour, a pre-trial release officer was not on duty and had to be called to the jail. Harriet Marr, a pre-trial release officer, arrived within one-half to one hour and interviewed Clemons in order to determine whether the posting of a bail bond would be necessary. It appears that in order to qualify for release on an unsecured bond, an arrestee had to compile a minimum of eight points in this interview and Clemons accumulated eighteen points, thereby indicating that her release was virtually certain. However, several attempts to locate a judge to approve her release were unsuccessful. While waiting for her release, Clemons was permitted to remain in the lobby with her husband. She was neither patted-down nor frisked at any time.
 
 
 10
 Shortly after completing her release interview, matron Kathy Mullins was called to the lobby, where she requested Clemons to follow her to a visitation room adjacent to the lobby. There, Mullins conducted what the defendant Jailer, Stratton, termed a 'thorough search.'[1] Although there is some dispute about the precise procedure followed in this case, Stratton testified as to his instructions for the performance of these searches, in general, as requiring the woman to remove all outer clothing, e.g., coat, sweater, etc., to allow the matron to check around the collar of her blouse, unbutton her blouse and unsnap her bra, lifting the bra to permit visual inspection. Then the matron was to check the waistband area and the woman was to lower her slacks to permit visual inspection of the thighs. Shoes and socks were to be removed and a pat-down of the lower legs followed. Finally, all pockets were thoroughly searched. Stratton testified that he instructed that panties were not required to be removed unless a weapon or contraband was found, after which a 'complete' strip search was to be performed upon his or a deputy jailer's authorization.[2]
 
 
 11
 Despite the fact that Clemons apparently could have been placed in a cell in which she may have contacted the general prison population, because she and her husband were well known in the area she was permitted to return to the lobby to await her release. Approximately thirty to forty-five minutes later, a judge was contacted and she was related. It appears that, had a judge not been located by the pre-trial release officer by 10:00 p.m., when she went off duty, Clemons would have been incarcerated for the remainder of the evening.
 
 II.
 
 12
 Defendants primary argument in the district court was that, under Bell v. Wolfish, 441 U.S. 520 (1979), so-called 'point of entry' searches of all prisoners are constitutionl provided they are conducted in a secluded atmosphere and in a minimally intrusive manner. Defendants also made additional arguments relating to qualified immunity for the Jailer and members of the County Fiscal Court (the county governing body who is charged by statute with provision, maintenance and upkeep of the jail). Clemons attempted to distinguish Wolfish by pointing out that that case dealt with strip searches of pre-trial detainees who were, in large part, incarcerated prior to trial on very serious charges and who were being searched after having potential contact with outside visitors to prevent the smuggling of drugs or contraband back into their cells. Clemons also argued in favor of municipal liability, alleging that although the Jailer was an elected official under the Kentucky Constitution and was paid by the state, he was in reality the policy maker for the county in all matters involving operation of the county jail.
 
 
 13
 Following presentation of Clemons' evidence to the jury, the trial judge granted a directed verdict to all members of the Fiscal Court, both individually and in their official capacities, finding only speculative evidence that the Jailer, Stratton, had ever consulted with any of the members with respect to his search policies and that, therefore, they had no knowledge of his policies nor had they helped develop or implement them. In addition, the judge granted a directed verdict in favor of Stratton on the issue of punitive damages only but allowed the case to proceed against him for compensatory damages under both Sec. 1983 and the pendent state law claim. In so ruling, the judge noted that he was allowing the case to proceed on these theories out of 'an abundance of caution,' since it was '[t]he Court's understanding that . . . upon the reasonable belief or probable cause to believe that a person will be a part of the general prison population, that a strip search of that person under conditions which will satisfy Wolfish would be permissible and not a violation of a person's constitutional rights.' App. 105.
 
 
 14
 Following the close of all the evidence, the trial judge granted Stratton's motion for directed verdict on the Sec. 1983 claim, stating 'I think on Wolfish when a person is to become in contact with the general jail population a visual strip search is permissible providing that it is done under proper circumstances.' App. 147. The court further found that even if the search was not conducted exactly according to policy, there was no evidence that Stratton had any knowledge of this or that the deviation was a pervasive one. Clemons appealed from the judgment granting directed verdicts as above to all defendants.
 
 III.
 
 15
 We review the trial court's grant of a directed verdict under the same standard used by that court in determining whether or not it was appropriate to grant the motion. Under Fed. R. Civ. P. 50(a), the court must determine whether, viewing the evidence and its reasonable inferences in the light most favorable to the nonmoving party, a material issue of fact was raised for the jury. See generally, Sawchik v. E.I. DuPont de Nemours & Co., 783 F.2d 635, 636 (6th Cir. 1986). Under this standard, we are convinced that the trial judge erred in granting the directed verdicts in this case.
 
 
 16
 Bell v. Wolfish involved a suit instituted by federal pretrial detainees at the Metropolitan Correctional Center in New York City challenging the propriety of visual body cavity searches. In upholding such searches in the absence of probable cause to suspect an individual inmate of concealing weapons or contraband, the Court specifically noted that the detainees were being held on serious federal charges, recognizing that the detention center was a 'unique place fraught with serious security dangers.' 441 U.S. at 559. The Court endorsed a balancing test for reasonableness of the search under the fourth amendment, taking into consideration 'the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.' Id.
 
 
 17
 It is clear from statements made by the trial judge that he perceived that only 'reasonable belief or probable cause to believe that a person will be a part of the general prison population' was required to authorize a strip search. However, 'intermingling is only one factor to consider in judging the constitutionality of a strip search.' Hill v. Bogans, 735 F.2d 391, 394 (10th Cir. 1984). When the facts of this case are analyzed in light of the teachings of both the Supreme Court in cases such as Wolfish as well as our recent decisions in Dufrin v. Spreen, 712 F.2d 1084 (6th Cir. 1983) and Dobrowolskyj v. Jefferson County, Nos. 86-5234/5451 (6th Cir. July 13, 1987), it is not clear that a reasonable juror could not have found that this strip search policy was in violation of Clemons' constitutional rights.
 
 
 18
 We stress that our decision rests solely on our conclusion that a jury question was presented on the facts of this case, and it should not be read as expressing any opinion on the constitutionality of the policy. The threshold issue to be addressed on remand will be the qualified immunity defense available to all the defendants in their individual capacities. And, since it is apparent that Jailer Stratton possessed final authority to establish and implement County policy with respect to the jail's strip search procedures, it is unnecessary to establish knowledge of those policies on the part of the Fiscal Court to find municipal accountability. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S. Ct. 1292 (1986).
 
 
 19
 Since we discern no evidence of evil motive or intent or of reckless or callous indifference to federally protected rights on the part of any of the defendants, the trial judge's grant of directed verdict as to punitive damages will be upheld. See Smith v. Wade, 461 U.S. 30, 56 (1983). Therefore, on remand any judgment in Clemons' favor must be limited to compensatory damages.
 
 
 20
 REVERSED and REMANDED.
 
 
 
 *
 Honorable Richard F. Suhrheinrich, United States District Court, Eastern District of Michigan, sitting by designation
 
 
 [1]
 Stratton testified that he based his search policies in large part upon training materials he received from the Kentucky Corrections Department. His official written policy, which was not formally adopted as county policy by the Fiscal Court until June of 1982, provided as follows:
 'The arrestee will be escorted to the search area and will be searched thoroughly. Matrons will search females. Strip searches will not be done unless the jailer feels probable cause exists which indicates necessity for doing so.'
 The term 'thorough search' was nowhere defined in the written policy materials. Therefore, as the trial judge pointed out, a 'thorough' search was, in effect, whatever Stratton said it was.
 
 
 [2]
 Stratton testified that he did not consider the searches as he instructed to constitute 'strip searches,' and that, in his view, a strip search occurred only when the arrestee was forced to remove all clothing and stand totally nude for inspection. Despite the semantic disagreement on this subject, the trial judge found that Stratton's search policy resulted in the performance of a 'strip search' and we agree