**Frank SMITH, Jr., Plaintiff,**

v.

**VILLAGE OF MAYWOOD and Robert Grace, Defendants.**

**No. 84 C 3269.**

United States District Court,
N.D. Illinois, E.D.

Oct. 19, 1988.

Jody Ann Lowenthal, Chicago, Ill., for plaintiff.

Peter M. Rosenthal, Cary Schwimmer, Steve Hogroian, Ancel, Glink, Diamond, & Cope, Ronald S. Cope, Keith A. Dorman, Robert Scott, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

PARSONS, District Judge.

The question for decision is whether the officials of the Village of Maywood, Illinois denied plaintiff property owner procedural due process rights in violation of the Due Process Clause of the Fourteenth Amendment when they boarded up a number of rental units in the property owned by the plaintiff without giving him notice or an opportunity to be heard before they took this action. The plaintiff invokes 42 U.S.C. section 1983 in claiming that he was deprived of substantial property interests as a result of the action of defendants.

On June 28, 1982, the Village's Department of Code Enforcement conducted an inspection of plaintiff's building located at

914 St. Charles Road in Maywood. The inspection was supervised by a Robert Grace acting in his capacity as the Village's Director of Code Enforcement. Following this inspection notices to cease occupancy were posted on four of the twenty-two dwelling units in the building. The signs indicated that it was unlawful for anyone to inhabit the posted dwelling units. Shortly after the inspection the posted units were boarded-up by the Sentry Security Board–Up Service in carrying out the directions of Robert Grace.

In deciding if the "boarding-up" of the rental units by the defendants deprived plaintiff of a property interest without due process of law, the oft repeated two-pronged test of *Turnquist v. Elliott* is noted:

> Determining whether there has been an unlawful deprivation of a constitutionally protected property interest is a two-part inquiry. First, the court must establish whether there is a property interest.... Second, if there is such an interest, the court must determine whether the person deprived was accorded due process.

*Turnquist v. Elliott,* 706 F.2d 809, 810–11 (7th Cir.1983).

Looking at the first prong of the inquiry, to have a property interest, "a person clearly must have more than an abstract need for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972). "A property interest can be created expressly or may arise through implication from a state agency's words, actions, rules, or 'mutually explicit understandings.'" *Turnquist v. Elliott,* 706 F.2d at 811; *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

The defendants contend that they did not deprive plaintiff of a constitutionally protected property interest because plaintiff could not have legally rented the units which had been boarded up. Defendants claim that plaintiff had not obtained a rooming house license, providing approval by the Village upon a notice of intent to rent, nor had he obtained a certificate of code compliance. Wherefor, they say, he could not legally rent the units and could not have asserted in this case a "legitimate claim of entitlement" to the rent from them.

The evidence indicates that the renting of the several units of this building had been ongoing since at least 1977, and presumably since 1970. The reasonable person would not understand why the defendants had chosen not to enforce the licensing and certification ordinances for well over ten years. They knew about the property and its rental use because they had, over the time, inspected it and had issued cleanliness and upkeep citations against it. A delay this long would constitute acquiescence on the part of defendants to the use to which they knew the plaintiff was putting it. We need not reach that question, however, because, assuming defendants were not precluded from acting to cease the ongoing use violation of their ordinances, it is the manner in which defendants acted to stop the violations of their occupancy ordinances which is the source of the controversy here.

This brings us to the second prong of the *Turnquist* inquiry. Was plaintiff afforded due process? By boarding up the units before either a notice to the owner of the planned boarding-up was given, or a chance for the owner to be heard in opposition to it was afforded, the plaintiff was denied the opportunity to show if he could that technically or otherwise he was not in violation of the ordinances or to both correct the violations and continue the rental of the units without substantial loss of income. In addition, there is evidence in the record that other tenants in the building, seeing the boarding-up of the four units, ceased renting the units in which they were living, as a result of which plaintiff was deprived of even more income.

■ The way in which defendants acted, that of summarily boarding up the units before either notice or a hearing were afforded, runs contrary to the procedures that were followed by their Department of Code Enforcement when it enforced other

ordinances against plaintiff and his property. Exhibits in evidence include notices of other ordinance violations on the part of plaintiff. They were sent to him. These exhibits are dated from May of 1978 to July of 1982. Each notice informed plaintiff of the specific problems he had to correct and specified a date by which the correction had to be completed. These notices were always sent to the plaintiff after an inspection of his premises had been completed. The penalty for not complying with the notice was always stated on it. If in fact the violations were not corrected within a prescribed time period, a complaint was then to issue. The notice informed the plaintiff of the ordinance he was violating and set a firm court date comfortably in the future for resolution of the matter in a court of law. Under this procedure, very clearly and unmistakably, notice and an opportunity to be heard always were provided the plaintiff property owner in this case. The testimony of the defendant Grace confirms this procedure.

According to the evidence there was an exception to this ordinary due process procedure. This exception was provided for in "life-saving" or "emergency situations" wherein, presumably, a tenant's or third person's life is immediately endangered by the condition or use.to which the premises at the moment was or would be exposed. Obviously, such emergency situations were those which at the posting or boarding up time had immediately prior thereto involved work of the fire department, the police department, or both. The property effected by the emergency would summarily be boarded up and the tenants would be relocated. Neither notice nor an opportunity to be heard could be given the owner before the necessary action would have to be taken. The evidence presented in the trial of this case showed that in the instances of this boarding-up and posting there was no such emergency involved and the ordinances authorizing them are not the subject of this controversy. There simply was no fire, no natural disaster, no life threatening danger, nor violent crime that justified this particular "boarding-up" procedure that was implemented by the defend-

ant Grace. The evidence supports the observation that what there was can be characterized as a loss of patience on the part of the new administration of a racially converted town with a property owner who might have been expected to cooperate with their efforts to make the village a source of pride but who, instead, was maintaining an almost nuisance type of dwelling unit that continued to be an embarrassment to the community. It would seem to the trier of the facts, in light of the well established law on due process that here, the normal procedure of the Village notifying the property owner of assessed ordinance violations found by the inspection, allowing him time to correct the violations, and issuing a complaint setting out those violations with a court date on it, warning that if the violation were not corrected in the time period reasonably prescribed, specific action would be taken, should have been the procedure followed. The evidence is that this was not done.

The evidence is that the defendant Grace, following an inspection of the premises on June 28, 1982, forthwith caused to be boarded up a number of the dwelling units. The violation notice dated June 30, 1982, the apparent basis upon which the units had been boarded up, contains nothing indicating an emergency or life-saving situation, even though, as has been observed, the units severely needed many significant improvements. In the absence of a standard emergency, the usual violation notice should have been sent to the plaintiff first, giving the plaintiff time in which to correct the violations, or in which to contest the accuracy of the complaint. This procedure which had been followed up until the boarding up on June 28, 1982, would have afforded the plaintiff adequate notice and a fair opportunity to be heard. It should have been followed here. *See, RR Village Assoc., Inc. v. Denver Sewer Corp.*, 826 F.2d 1197 (2d Cir.1987).

█ The defendants persist after trial of the case in their contention that the Village of Maywood itself should have been dismissed as a defendant. For purposes of imposing liability on the Village in this

case, the court must find from the evidence that Robert Grace, as Director of Code Enforcement, had final authority to establish municipal policy with respect to the boarding up and the placing of signs on dwelling units. As was stated in *Pembauer v. City of Cincinnati*, 475 U.S. 469, 481–83, 106 S.Ct. 1292, 1299–1300, 89 L.Ed.2d 452 (1986), "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority . . ."

The Code of the Village of Maywood at section 16.10, in force at the time Robert Grace was Director of Code Enforcement, gives to the director the authority to promulgate "such rules and regulations as he deems necessary to enforce the provisions of this chapter" subject to approval by the Board of Trustees. The approval by the Board of Trustees of Robert Grace's actions in ordering the inspection, and the boarding-up and placarding of dwelling units in the 914 St. Charles Road property, would have to be inferred from evidentiary circumstances in the case, rather than from direct or primary evidence.

As Director of Code Enforcement he supervised as many as 27 employees of the Village. Meetings of the Board of Trustees were conducted to keep village authorities appraised of his activities. There was evidence, for example, that Grace decided which buildings in the Village were to be inspected and how often they were inspected. The time periods for correction were also set at his sole discretion or by the license inspectors who worked under him. It was his decision to have "team inspections" and to board up various buildings or units of buildings. It was his decision in this instance to disallow occupancy of the units at 914 St. Charles Rd. in Maywood on June 28, 1982. It was his decision to board up those units.

The issuance of a municipal order to disallow occupancy of a certain type of dwelling unit and a municipal order to board up those of such dwelling units which offend the reason for the order sound in the form of the execution of official policy. Unless there is evidence to the contrary, such an order would be issued by one clothed with sufficient governmental authority to be determining that policy on behalf of the municipality. As the court in *Pembauer* stated, ". . . municipalities often spread policy-making authority among various officers and official bodies." *Id.* 475 U.S. at 483, 106 S.Ct. at 1300.

There is testimony that one Harlan Mayberry, the Village Manager at the time, was kept appraised of the situation at 914 St. Charles Road, and particularly of what was happening on June 28, 1982. The evidence is that Village Manager Mayberry never questioned nor voiced disapproval of Mr. Grace's action with regard to 914 St. Charles Road. This acquiesence on the part of the Village Manager, together with the responsibilities and duties entrusted to Robert Grace by the board of the municipality in his performing as Director of Code Enforcement, lead the trier of fact to the conclusion that, realistically, Robert Grace had the authority to set policy for the village with reference to the inspection and boarding up of residential properties. Finding, as I must on the evidence, that Mr. Grace was clothed with that authority, his action on June 28, 1982, was not "unauthorized nor random." *Compare with Monell v. Dept. of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

According to *Pembauer, supra,* the finding must be that the Village of Maywood and Robert Grace were jointly liable for those actions which I find deprived plaintiff of a property interest without procedural due process of law, this in violation of the Fourteenth Amendment. Verdict is entered on the issue of liability for the plaintiff and against the defendants.

■ On the matter of damages, the court finds that had the defendants not summarily boarded up the units in plaintiff's building, he still would have had to expend a substantial sum of money to bring not only the boarded units up to code standards, but also the rest of the units. However, these corrections could have been made while tenants were occupying the units so that plaintiff's operations

would not have had to sustain any loss of monthly rental income. In addition, the inference is reasonable that he would not have lost the tenants whose units were not boarded up but who left as a result of defendants' actions. A fair assessment of consequential damages would be what the plaintiff may be found to have lost in monthly rental income for a calculated period of time from the building in question. The court calculates that this amount would be the net monthly income before the units were boarded up less the net monthly income received after the units were boarded up, multiplied by the number of months it would reasonably have taken for plaintiff to correct the code violations listed on the violations notices dated June 30 and July 2, 1982. Considering the kinds of corrections that would have to have been made, a reasonable time for making them would appear to be three months.

Looking to exhibits in evidence, it appears that the last reported monthly income statement before the boarding up was that for the month of May, 1982. The net income for that month was $1,696.80. The net income for the month following the boarding up, the month of July was $188.20. The difference between the two figures is $1,508.60.. Multiplying this figure by three (number of months it would reasonably take for plaintiff to bring the units up to code standards) this figure comes to $4,525.80. Plaintiff is awarded this amount. In addition, plaintiff is awarded reasonable attorney fees pursuant to 42 U.S.C. section 1988 and costs. It is so ordered.