**Timothy SANCHEZ and Yvonne Sanchez, Plaintiffs,**

v.

**Henry L. CRUMP, Jr., Maggie L. Crump, City of Detroit, City of Inkster, and Donald Oehmke, Defendants.**

No. 00–75358.

United States District Court,
E.D. Michigan,
Southern Division.

Jan. 29, 2002.

Matthew M. Evans, Livonia, MI, for Plaintiff Counsel.

Miriam L. Blanks–Smart, City of Detroit Law Department, Detroit, MI, for Defendants City of Detroit, Oehmke Counsel.

Kirk I. Tousaw, Jaffe, Raitt, et al., Detroit, MI, for Defendant Crump Counsel.

Edward D. Plato, Secrest, Wardle, et al., Farmington Hills, MI, for Defendant City of Inkster Counsel.

### OPINION AND ORDER

FEIKENS, District Judge.

At issue is a contract concerning the sale of a 1987 Thompson 29–foot Daytona speed boat from defendant Henry Crump, Jr. ("Crump") to plaintiffs Timothy and Yvonne Sanchez ("Sanchezes"). At the time the events occurred which gave rise to the suit, Crump was the Acting Assistant Chief of Police of the City of Inkster ("Inkster"). Plaintiffs are suing the Crumps, Inkster, the City of Detroit ("Detroit"), and Detective Oehmke ("Oehmke") for violations of 42 U.S.C. § 1983 based upon their alleged unlawful arrest and prosecution.[1] They also plead supplemental state claims, including malicious prosecution, abuse of process, civil conspiracy, concert of action and fraud. The remedy prayed for is $1,000,000 damages, rescission of the contract and restitution of all monies. All defendants have moved for summary judgment or to dismiss. For reasons discussed below, the defendants' motions for summary judgment under 42 U.S.C. § 1983 are granted.

### I. FACTUAL BACKGROUND

On April 16, 1996, Crump entered into an installment loan and security agreement ("mortgage") through National Bank of Detroit ("NBD") to purchase a boat, using the boat as collateral.[2] According to the terms of the mortgage, Crump could not "sell or transfer control of the collateral." He also had to "keep it in good condition and repair, and if personal property, to keep it readily available if we need to recover it." (Def. City of Detroit Br. Supp. Mot. Dismiss at Ex. B, Loan Agreement, page 1.) Despite the terms of his mortgage, Crump "wanted to sell his boat." (Def. Crump Br. Supp. Mot. Summ. J. at 2.)

On or about June 27, 1998, Crump entered into an agreement to sell the boat to the Sanchezes. The NBD mortgage was

---

1. The City of Inkster was dismissed pursuant to the parties' agreement.

2. No payment history or evidence of the mortgage other than the original agreement between NBD and Crump has been submitted to the court.

clearly disclosed to the Sanchezes. (Def. Crump Br. Supp. Mot. Summ. J. at Ex. A, Contract at ¶ 9.) Crump included a provision in the contract which would hold the Sanchezes liable on the mortgage should Crump default.[3] The Sanchezes took possession of the boat subject to the mortgage.[4] However, there is no evidence of assignment of the mortgage or a novation of the mortgage.

The Sanchezes were to make monthly payments to Crump via money order or cashier's check by the 15th of each month. (Def. Crump Br. Supp. Mot. Summ. J. Ex. A, Contract at ¶ 1). As of June 26, 1998 (the date on which the contract was entered into), the first month's payment of $347.50 had been received. Payments were timely made through October, 1998.

In both November and December, 1998, however, the Sanchezes were late on their payments by two weeks. The January, 1999, payment was late by four weeks. No payment was received for February, March or April, 1999. Crump claims he tried to contact the Sanchezes, but was not successful.

On April 29, 1999, Crump went to the Detroit Police Department ("DPD"), introduced himself as the Acting Assistant Chief of Police for the City of Inkster, and claimed the Sanchezes had embezzled his boat. Crump mistakenly told the DPD that he had not received any payments since November 1998, and had not been able to make contact with the Sanchezes.[5] He claimed he had no idea where his boat was located. No action was taken by the DPD.

On or about May 11, 1999, Crump again contacted the DPD, and spoke first with Lieutenant Maryann Caretti, who directed Crump to Oehmke. Before the meeting, Crump himself had typed up the "pertinent facts on a standard request for warrant form." (Def. Crump Br. Supp. Mot. Summ. J. at 4.) Oehmke met with Crump, rubber-stamped the warrant request and submitted it to an Assistant Wayne County Prosecutor who signed it. It was forwarded on to a judge, who signed an arrest warrant on May 12, 1999.

Timothy Sanchez sent a letter to Crump at about the time the warrant was signed. He explained that he had been injured on the job, and pledged one monthly payment each week until "I catch up." (Def. Crump Br. Supp. Mot. Summ. J. at Ex. F.) The Sanchezes sent three payments in May, 1999. These payments were accepted by Crump. Crump did not tell the DPD or the Prosecutor's Office about the attempt

---

**3.** "Under the terms of the security agreement between the Secured Party and the Seller it is the obligation of the Seller to make monthly payments to the Secured Party [sic] Buyer herewith agrees to timely make to the Secured Party any and all monthly payments required under the terms of said security agreement. IT IS THE SOLE RESPONSIBILITY OF THE SELLER TO PAY THE SECURED PARTY THE DEBT DUE UNDER THE SECURITY AGREEMENT BETWEEN THE SELLER AND THE SECURED PARTY, EVEN IF THE BUYER FAILS TO MAKE THE MONTHLY PAYMENTS CALLED FOR BY THIS VESSEL PURCHASE AGREEMENT." (Def. Crump Br. Supp. Mot. Summ. J. at Ex. A, Contract at ¶ 9.)

**4.** Under the contract, the Sanchezes had to maintain the vessel in the same condition as it was when they received possession of it, on or about June 26, 1998. (Def. Crump Br. Supp. Mot. Summ. J. at Ex. A, Contract at ¶ 4.) They had to inform Crump of the location of the vessel at all times. (Def. Crump Br. Supp. Mot. Summ. J. at Ex. A, Contract at ¶ 12.)

**5.** Defendants contend that Crump's mistakes were inadvertent. Once he reviewed his records, he in fact testified at the Sanchez criminal trial that he had received late payments through January, 1999. Both parties agree no payments were received for February, March or April, 1999. Three payments were received in May, 1999, but never reported to the DPD.

to cure the defaults by the Sanchezes. Plaintiffs allege payments were sent through August, 1999.

On July 27, 2001, the Sanchezes were arrested in Ohio on the 1999 warrant. They were released, and they turned themselves in to the DPD. They waived their right to a preliminary examination, went to trial in Wayne County Circuit Court and were acquitted on a directed verdict.

Crump filed a Motion for Summary Judgment on September 20, 2001. Defendants Oehmke and Detroit filed a Motion to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6). Since Detroit has attached extrinsic materials to its motion, it is more properly characterized as a motion for summary judgment. Fed. R.Civ.P. 12(c). For reasons discussed below, both motions are granted as to 42 U.S.C. § 1983.

## II. DISCUSSION

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). I must view the evidence and any inferences drawn from the evidence in a light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (citations omitted), *Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir.2001).

■ "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). To meet this

legal standard, a plaintiff must demonstrate that 1) he or she was deprived of a right established under either the Constitution or laws of the United States, and 2) the deprivation was caused by a person acting under color of state law. *See Redding*, 241 F.3d at 532, *Simescu v. Emmet County Dep't of Soc. Services*, 942 F.2d 372, 374 (6th Cir.1991). If a plaintiff fails to make a showing on either element of his § 1983 claim, it must fail. *See Simescu*, 942 F.2d at 375.

### 1) Crump

At the time the events occurred which gave rise to the suit, Crump was the Acting Assistant Chief of Police of the City of Inkster. It is undisputed that Crump did not arrest or prosecute the Sanchezes. The Sanchezes contend, however, that but for Crump's preparation of the warrant request form, and his relationship to the DPD in general, the warrant would not have issued, and they would not have been arrested or prosecuted. (Pl. Br. Opp. Def. Crump's Mot. for Summ. J. at 6–9.) The issue, then, is whether Crump was acting under color of state law when he filled out the warrant request form and contacted the DPD. I conclude that he was not.

■ Acting under color of state law requires that the defendant in a § 1983 action must have exercised the power "possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *West*, 487 U.S. at 49, 108 S.Ct. 2250, *Pickard v. City of Girard*, 70 F.Supp.2d 802, 806 (N.D.Ohio 1999) (noting that the injuries suffered by the plaintiff must be caused by the actions of the defendant officer). The "[a]cts of police officers in the ambit of their personal, private pursuits fall outside § 1983...The fact that a police officer is on or off duty, or in or out of uniform is not controlling." *Stengel v.*

*Belcher,* 522 F.2d 438, 440–41 (6th Cir. 1975). Thus, the focus of the analysis must be the nature of the defendant officer's actions and the factual context out of which those actions arose. *See Hudson v. Maxey,* 856 F.Supp. 1223, 1227 (E.D.Mich. 1994). No one factor is dispositive, and instead I consider the cumulative effect of the facts upon the case at hand. *Id.*

 In determining whether Crump acted under color of state law, I must consider whether he acted pursuant to an official duty, or whether the act was instead private in nature. "In order for liability to attach, the action alleged by the plaintiff to be 'under color of law' must be pursuant to some official duty or function of the officer and the factual context must be one which might reasonably be expected to require the intervention of the state through one of its agencies." *Hudson,* 856 F.Supp. at 1228. If the defendant officer acted pursuant to an official duty, or "in the line of duty," he acted under color of state law. *Stengel,* 522 F.2d at 441 (off-duty out-of-uniform officer who intervened in bar brawl acted "in line of duty" as determined by internal affairs review panel), *Pickard,* 70 F.Supp.2d at 805–06 (listing three limited situations where officers act under color of state law), *Hudson,* 856 F.Supp. at 1226–27 (officers act under color of law when their actions were pursuant to some official duty or function of the officer), *Santine v. Roberts,* 661 F.Supp. 1165, 1166 (D.Del.1987) (rejecting motion for summary judgment because officer acted under color of state law).

 If the act was private in nature, however, the actions of Crump are not acts undertaken by color of state law. *See Redding v. St. Eward,* 241 F.3d 530, 533 (6th Cir.2001) (finding officer's acts were "functionally equivalent to that of any private citizen calling for police assistance" and the "sole nature of the act she performed was to report what she believed to be a criminal act."), *Delcambre v. Delcambre,* 635 F.2d 407, 408 (5th Cir.1981) (assault upon sister-in-law by police chief on police station property was not under color of state law because it arose out of family and political matters).

 Even if the act was private in nature, however, the officer may still have acted under color of state law if he or she improperly exercised official authority to forward his or her interests in personal matters. *See Pickard,* 70 F.Supp.2d at 805. Officers act under color of state law when they have "engaged in official conduct, purported to be engaged in official conduct, and/or used a weapon issued to the officer by the law enforcement agency." *Id.* at 805–06. "[M]anifestations of official authority include flashing a badge, identifying one's self as a police officer, placing an individual under arrest, or intervening in a dispute between third parties pursuant to a duty imposed by police department regulations." *Id.* Other factors to consider include whether the officer "signed the complaint on police department stationery and listed his address as that of the police station." *Santine,* 661 F.Supp. at 1166. In deciding whether Crump improperly exercised official authority, I must consider whether the officer's influence caused the warrant to issue. *Redding,* 241 F.3d at 533.

In *Stengel v. Belcher,* the U.S. Court of Appeals for the Sixth Circuit found that an off-duty, out-of-uniform officer had acted under color of state law when he intervened in a brawl, used his department-issued Mace and handgun, and attempted to arrest those involved in the fight. *Stengel,* 522 F.2d at 441. In *Stengel,* the Chief of Police testified that in any situation which poses a potential harm to the public, the officer had an official duty to take action "in any type of police or criminal activity 24 hours a day." *Id.* Further, the

police department's own investigation division found that Officer Belcher's actions "were performed in the line of duty" and that he qualified for worker's compensation because of his injuries. *Id.* The Sixth Circuit held that this evidence was sufficient to show that Officer Belcher had acted under color of law.

In a similar case to the one before me, however, a police inspector received an obscene phone call in the middle of the night at his residence. *Perkins v. Rich,* 204 F.Supp. 98 (D.Del.1962). The next morning, he went to a nearby police station and swore out a complaint. The district court held that the defendant's act in swearing out the complaint was purely private and was not carried out under color of state law. The "mere fact that the person who swore out the complaint was a police officer did not automatically transform the action to one arising under color of state law." *Santine,* 661 F.Supp. at 1166 (discussing the rationale and holding in *Perkins*). The court concluded that the police inspector signed a complaint "as could any private citizen," and noted that the arrest of the plaintiff and ensuing trial were carried out by other officials. *Perkins,* 204 F.Supp. at 100.

▬ The nature of the "official act" committed by Crump in this case does not rise to the level of the acts performed by the off-duty police officer in *Stengel,* and was not committed under color of state law. *See Pickard,* 70 F.Supp.2d at 806. First, Crump did not act pursuant to an official duty, or "in the line of duty." No independent review found that he had acted under color of state law. He did not use a department-issued handgun. He did not physically arrest, restrain or attempt to restrain the plaintiffs. He did not file the warrant request form in Inkster, and did not direct the City of Inkster police to arrest plaintiffs. The matter of the alleged embezzlement of his boat was a personal, not a professional matter. When he reported what he believed to be the embezzlement of his boat to the DPD, Crump's actions were the functional equivalent of any private citizen calling for police assistance. *Redding,* 241 F.3d at 533.

I find that Crump did not improperly exercise his official authority in this personal matter to an extent that would warrant a finding that he acted under color of law. I note, however, that Crump himself completed the warrant request on an official Inkster Police Department form, and listed his work address and phone number. He also appeared in person at the DPD, and identified himself as a police officer in his conversation first with Lieutenant Caretti, and then with Oehmke. (Dep. Of Oehmke, July 26, 2001, at p. 10–11.) But I find, however, in light of all the circumstances, that the use of the Inkster form, the placement of his work address and phone number, and his introduction of himself as a police officer which exhibited poor judgment by Crump, does not warrant a finding that he acted under color of law.[6] The fact that he was a police officer when he reported the alleged embezzlement does not transform this action to one arising under state law. *Santine,* 661 F.Supp. at 1165.

Further, there is no evidence that Crump's status as an "Acting Assistant Chief of Police" in Inkster influenced the DPD, the Wayne County Prosecutor, or

---

**6.** Plaintiffs make much of the fact that parts of the warrant request form completed by Crump contained factual errors. However, these allegations offer them no help in supporting their allegation that Crump acted under color of law. *See Kahermanes v. March-* *ese,* 361 F.Supp. 168, 171 (E.D.Pa.1973) ("The deliberate giving of false information by an individual to a police officer to cause the arrest of another does not give rise to a cause of action under the Civil Rights Acts.").

the Magistrate Judge, each of whom evaluated and signed the warrant. In fact, it took two tries for the DPD to even respond to Crump. He first contacted the DPD on April 29, 1999. The DPD did not reply. Crump then contacted them a second time two weeks later, on May 11, 1999. It was only after the second contact that the DPD acted upon his complaint. In addition, Oehmke testified in his deposition that he believed there was probable cause when the warrant issued. (Pl. Br. Opp. Def. City of Detroit and Oehmke Mot. Dismiss at Ex. I, Dep. Oehmke, July 26, 2001, at 18.)

As plaintiffs have failed to meet the legal standard necessary to bring a cause of action under § 1983, their claim against Henry and Maggie Crump must fail. The defendants' motions for summary judgment as to Henry and Maggie Crump are granted.

**2) Oehmke**

 In issuing the warrant request form, Oehmke acted under color of state law. To meet the legal standard for a § 1983 claim, however, plaintiffs must show that a constitutional deprivation of their rights occurred as a result of Oehmke's actions. Since I find that Oehmke had probable cause when he approved the warrant request form, no constitutional deprivation of rights occurred, and plaintiffs cannot sustain their § 1983 claim.

Plaintiffs allege that Oehmke was negligent in that he failed to adequately investigate the allegations made by Crump in the application for the arrest warrant. However, probable cause is a matter of the appearances presented to the defendant. *Coogan v. Wixom,* 820 F.2d 170, 173 (6th Cir.1987) (*citing Koski v. Vohs,* 426 Mich. 424, 434, 395 N.W.2d 226 (1986) (citations omitted)). The facts as alleged by Crump to Oehmke, while they did contain errors, created probable cause to arrest. The elements of embezzlement by a chattel mortgagor (M.C.L.A. § 750.177) are:

1. Intent to defraud, embezzle or fraudulently remove, conceal or dispose of;
2. Property held by the criminal defendant;
3. Which property is subject to a chattel mortgage or contract to purchase not yet fulfilled;
4. And the property has a value of $20,000 or more.

M.C.L.A. § 750.177 (2001). As admitted by plaintiffs, the boat was in their possession, subject to a mortgage, and was valued in excess of $20,000. (Compl. at ¶¶ 5, 14, 61.) Since they had not made payments on the boat for at least three months, it was reasonable for Oehmke to infer criminal intent from the plaintiffs' failure to pay. These facts taken together meet the standard of probable cause. *Koski,* 426 Mich. at 436, 395 N.W.2d 226.

 Further, Oehmke was not required to fully investigate the allegations made by Crump. "Where there are sufficient facts to warrant a prudent person in a defendant's position to believe that a crime was committed, and that the person charged committed it, 'the failure to make a further investigation does not negate probable cause.'" *Coogan,* 820 F.2d at 173 (citations omitted).

 Plaintiffs argue that the entry of a directed verdict when they were prosecuted in Wayne County Circuit Court proves Oehmke did not have probable cause to issue the warrant. (Compl. at ¶ 18.) Acquittal on a criminal charge does not vitiate the existence of probable cause. "The Constitution does not guarantee that only the guilty will be arrested. If it did, § 1983 would provide a cause of action for every defendant acquitted-indeed, for ev-

ery suspect released." *Baker v. McCollan,* 443 U.S. 137, 145, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). Plaintiffs have failed to show a constitutional deprivation of their rights, and cannot sustain a § 1983 claim against Oehmke.

### 3) The City of Detroit

■ Plaintiffs allege that the Detroit Police Department, and therefore the City, "tolerated, ratified, permitted, or acquiesced in the creation of policies, practices, and customs, establishing a de facto policy of deliberate indifference to individuals such as plaintiffs." (Compl. at ¶ 27.) Such a policy, they allege, caused their arrest and prosecution which they contend was unconstitutional and in violation of their rights.

■ The liability of a municipality under § 1983 is limited. "[T]he complainant must identify the policy, connect the policy to the city itself and show that the particular injury was incurred because of the execution of that policy. Plaintiff must, of course, prove that his injury was caused by city policy." *Coogan,* 820 F.2d at 175, *see also Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986) (defining policy as "a deliberate choice to follow a course of action...from among various alternatives"). The plaintiff may establish the existence of a policy by repeated "deliberate indifference" to a frequently recurring circumstance. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989).

■ Plaintiffs allege that Detroit had a "de facto policy of deliberate indifference to individuals such as Plaintiffs." (Compl. at ¶ 27.) Establishment of a policy under a theory of deliberate indifference requires the court to find a policy by implication. Plaintiffs offer no proof that an arrest such as theirs has ever previously occurred as part of a policy.

In their response to the defendants' motion, however, they recharacterized their original theory and alleged the DPD failed to adequately train Oehmke. Plaintiff stated "[E]ven a layperson would be able to conclude that a 'detective' assigned to the 'Investigative Operations Unit' would perform investigations. This shows that Detective Oehmke was so poorly trained that he did not know even the basic duties of his job." (Pl. Br. Opp. Def. City of Detroit and Oehmke Mot. Dismiss at 12.)

■ Liability under § 1983 attaches only where the failure to train amounts to "deliberate indifference" to the rights of persons with whom the police come into contact. *City of Canton v. Harris,* 489 U.S. 378, 388, 109 S.Ct. 1197, 1205, 103 L.Ed.2d 412 (1989). Plaintiffs cannot show any deliberate indifference on behalf of the DPD.

■ A local government cannot be sued under § 1983 for injuries caused by its agents under the theory of respondeat superior, unless those persons are executing the government's policies or customs. *Monell v. New York City Dep't of Social Services,* 436 U.S. 658, 691, 695, 98 S.Ct. 2018, 2036, 2038, 56 L.Ed.2d 611 (1978). Having failed to demonstrate the existence of a policy or custom, Detroit cannot be held liable for the actions of Oehmke solely by virtue of his employment.

As plaintiff has failed to make any showing that Oehmke was acting in accordance with a policy of deliberate indifference, or that Oehmke was inadequately trained, their claims under § 1983 against Detroit fail.

### 4) Pendent State Claims

■ "It has long been understood that if the federal claims that are the basis for jurisdiction are eliminated from the case, the federal court has discretion whether to

exercise pendent jurisdiction over the remaining state-law claims or to decline to exercise that jurisdiction." 13B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure: Jurisdiction,* 3567.1 (2d ed. Supp.2001) (footnote omitted). Once a § 1983 claim is dismissed, it is within the discretion of the district court judge to exercise jurisdiction over the remaining state law claims. *See Whittington v. Milby,* 928 F.2d 188, 194 (6th Cir.1991) (citations omitted), 42 U.S.C. § 1367(c)(3) (2001) (a district court may decline to exercise supplemental jurisdiction over a claim if that court "has dismissed all claims over which it has original jurisdiction").

In my discretion, I decline to exercise supplemental jurisdiction over plaintiffs' remaining state law claims of malicious prosecution, abuse of process, civil conspiracy, concert of action and fraud.

## III. Conclusion

In sum, defendants' motions for summary judgment under 42 U.S.C. § 1983 are granted. I decline to exercise jurisdiction over plaintiffs' supplemental state claims, including malicious prosecution, abuse of process, civil conspiracy, concert of action, and fraud, and they are dismissed without prejudice.

**IT IS SO ORDERED.**