**Donald J. O'MARA, III, Patrick L. O'Mara, Sr., and Absolute Property Management, Inc. Plaintiffs,**

v.

**TOWN OF WAPPINGER, Defendant.**

**No. 03 CIV. 9814 (CM)(MDF).**

United States District Court, S.D. New York.

Dec. 2, 2005.

Maurice J. Salem, Patterson, NY, for Plaintiffs.

Emanuel F. Saris, Albert Philip Roberts, Vergilis, Stenger, Roberts, Pergament & Viglotti, LLP, Wappingers Falls, NY, for Defendant and Counter Claimant.

Kenneth Corbett Brown, Bleakley Platt & Schmidt, LLP, White Plains, NY, for Plaintiffs and Counter–Defendants.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND VERDICT

MCMAHON, District Judge.

The Court, for its findings of fact, conclusions of law and verdict after trial in the

above-captioned action: [1]

**Findings of Fact**

1. Dutchess County uses the grantor-grantee system for the recording of deeds, mortgages, easements, restrictions and other conveyances of an interest in real property.

2. On or about November 27, 2000, Absolute Property Management (a corporation owned by Donald and Patrick O'Mara) acquired fee ownership of two parcels of property (Parcels B and E) located adjacent to the Wildwood Condominium development in the Town of Wappinger in Dutchess County. The two parcels abut New Hackensack Road (County Road 104) and are separated by Wildwood Drive. Absolute was the successful bidder at an in rem tax sale held on October 18, 2000. The acquisition price for the two parcels was $29,500.

3. In the tax deed (PX 13), the property was described as "ALL that tract, piece or parcel of land, situate in the Town of Wappinger, County of Dutchess, State of New York, described as follows: SWISS CODE # 135689 TAX GRID NO. 6158–02–848764–00." Absolute took title "Subject to any existing right of way and easement, and any and all existing restrictions, conditions and covenants *of record.*" *Id.* (Emphasis added)

4. Prior to closing on the purchase, the plaintiffs made arrangements for title insurance and a title search through Quaker Abstract Inc. Attached to the title insurance policy issued by First American Title Insurance Company of New York (PX 12) is a Schedule B, which discloses any and all burdens on the property that were of record in the Office of the Dutchess County Clerk or any relevant taxing authority. Schedule B contains no mention of any "open space" or "no build" restriction on either Parcel B or Parcel E.

5. The grantor-grantee records in the Office of the Dutchess County Clerk reveal that these two parcels, along with additional parcels, had been sold on July 23, 1962, by one Martha Reifler Meyers to David Alexander and Fred J. Lafko. (PX 12) Messers. Lafko and Alexander were developers, under the corporate rubric Skyview Development Corp. They set about developing the property acquired from Mrs. Meyers (the entire parcel will be called the Old Meyers Parcel) as a condominium project to be known as Wildwood Manor.

6. On or about December 17, 1962, the Town of Wappinger Planning Board passed a resolution tentatively approving a Preliminary Layout for the development of the property, prepared by S.H. Klein, Architect, and Brinner–Larious, Surveyors (Plan # 62/573/02). The tentative approval was subject to certain conditions, design conditional and required improvements, all of which were set forth in the minutes of the meeting (PX 4). Among the design conditions imposed by the Planning Board was that something called the "buffer" area "shall be designated as permanent open space on the plat." Although the "buffer" area is not identified in the resolution, it is undisputed that it consists of Parcels B and E.

1. This trial began with a jury seated. However, after plaintiffs rested, it seemed clear that the material facts were not really disputed and that the question that was going to be dispositive of the case—was the Planning Board restriction enforceable against plaintiffs, or were they bona fide purchasers without notice who took the disputed land free and clear of the restriction?—was a question of law. After discussion with counsel and an on-the-record colloquy with plaintiffs and representatives of defendant, both sides waived a jury at that point. The rest of the evidence was presented to the Court. The parties have since filed post-trial briefs.

7. PX 4, the minutes of the Planning Board of December 17, 1962, is not of record in the Office of the Dutchess County Clerk. It is, however, on file in the Office of the Town Clerk of the Town of Wappinger.

8. On or about January 23, 1963, the Town of Wappinger Planning Board approved a Plat of Wildwood Manor (PX 3B), showing the property divided into seven parcels: Parcel A (which would eventually become Wildwood Drive, a dedicated street), Parcels C and D (small parcels immediately adjacent to New Hackensack Road that were expressly reserved for street widening or realignment), the "buffer" area (parcels B and E), and two larger parcels (F and G). The minutes of the Planning Board for that evening (PX 5) indicate that the Board accepted the plat subject to eight conditions, one of which was: "8. That no building permits will be issued for Parcels B and E, as indicated on the Subdivision Plat."

9. The words "Open Space" appear on Parcels B and E on PX 3B.

10. Neither PX 3B nor PX 5 is of record in the Office of the Dutchess County Clerk. Both documents are on file in the Office of the Town Clerk of the Town of Wappinger. PX 3B is filed as Map No. 3107.

11. On November 26, 1963, Fred Lafko, as President of Skyview Development Corp., signed a deed (PX 6) conveying Wildwood Drive and several intersecting roads, as depicted on Map No. 3107, to the Town of Wappinger.

12. PX 6 was recorded in the Office of the Dutchess County Clerk on September 15, 1964.

13. On or about December 5, 1963, the Town Board of the Town of Wappinger accepted the dedication of "Wildwood Drive as sown[sic] on a certain map entitled 'Plat of Wildwood Manor,' dated December 15, 1962 (PX 3B), which said Wildwood Drive on said latter map is designated thereon as parcel 'A' as a public highway of the Town of Wappinger." (PX 8).

14. At the same meeting, the attorney for Lafko and Alexander presented to the Town a deed of 6 acres of property for recreational purposes, with a right of way. This deed was offered at the request of the Planning Board. The Town Board deferred accepting the deed (PX 8), and there is no evidence in the record that is was ever taken up again. Plaintiffs argue that this was a tender of Parcels A, B and E. However, I conclude that the six acres so tendered were not in Wildwood Manor, but rather across New Hackensack Road, in Quiet Acres (a separate development), for the following reasons:

(A) Parcels B and E alone consist of 4.653 acres of land, not six acres of land.

(B) Adding Parcel A to Parcels B and E brings the total amount of land to just under 6 acres. But Parcel A (Wildwood Drive) *was* accepted by the Town Board, but for dedication as a public road, not for Recreational Purposes. For that reason, Parcel A cannot be part of a tender of land that was not accepted by the Town.

(C) The Town Board deferred action on accepting the tendered deed so it could meet with the Quiet Acres Civic Association. (PX 8) If the Quiet Acres Civic Association was the relevant body, then the tendered land was most likely in Quiet Acres, not Wildwood Manor.

15. In all respects, the process followed by Lafko and Alexander and by the Planning Board comported with the 1961 subdivision rules that were in effect in December 17, 1962, and January 23, 1963. The Town of Wappinger adopted its first Zoning Ordinance on January 29, 1963; that

ordinance had no applicability to the matters in suit.

16. The Wildwood Condominiums were built on Parcel G and have been occupied for many years. For almost 40 years, Parcels B and E have remained undeveloped. It appears to the Court that they were used by local builders as an unofficial dump site.

17. The Planning Board's condition for acceptance of the subdivision plan—that Parcels B and E should remain permanent open space, and that no building permit should ever issue for those parcels—was not converted to an easement or other form of conveyance, and it is not of record in the Office of the Dutchess County Clerk.

18. Notwithstanding the Planning Board's restrictions, at some point (I cannot ascertain the exact date) the Wappinger Tax Assessor increased the assessment on the property from $7,500 to $47,500, noting on his records, "No reason for this very low value. Good buildable land." (PX 70)

19. Plaintiffs acquired Parcels B and E with the intention of constructing ten single family houses thereon—one of which was intended for plaintiff Donald O'Mara and his family.

20. After acquiring ownership of the Parcels, plaintiffs granted a permanent easement to the Town of Wappinger for an additional water line. (PX 27) The easement was properly recorded in the Office of the Dutchess County Clerk. (*Id.*)

21. Plaintiffs took several steps toward the execution of this project. Among those steps was the commissioning of a survey of Parcel B, on which Donald O'Mara's house was to be built. The survey was completed on or about September 30, 2002, by Gerald L. Lynn, a Licensed Land Surveyor. Lynn's survey (PX 17) indicated that the parcel numbers ". . . . are as shown on Map entitled 'Plat of Wildwood Manor' and filed as Map No. 3107." The survey also indicates that it was ". . . . dependent on F.M. 3107, 10806 and 10783. . . ." Mr. Lynn testified that he saw Map 3107 while performing his survey and noted the "Open Space" notation on Parcel B. However, he deemed the notation unclear and hence irrelevant to plaintiffs' rights in the property (*See also* PX 47)

22. Another step was to put together construction financing. The O'Mara brothers' mother took out a mortgage on her own home in the amount of $300,000 to help finance the development of the subdivision.

23. Building plans for the residence were filed with the Town. (PX 31). Mr. O'Mara received a building permit for his house from Sal Morello, Building Inspector of the Town of Wappinger, on June 10, 2003. (PX 28, 29)

24. Mr. O'Mara acquired a pre-fabricated house, costing over $60,000, to use as a significant portion of his home. (PX 30) He performed substantial additional construction to enlarge the pre-fabricated house. A temporary construction trailer was installed on the site and given a certificate of occupancy (not for habitation) by the Town's Zoning Administrator, Tanya Lukianoff. (PX 32)

25. On August 7, 2003, Lukianoff approved the interim survey for the lot on which the O'Mara house was to be built. The Town conditioned the approval on O'Mara's agreement to build the driveway in a particular place. (PX 33) Two days earlier, the Fire Inspector had approved the site plan (PX 34). In July and August 2003, the site was inspected several times by Town officials. (PX 35)

26. As should be readily apparent from the foregoing, no responsible person in the Town of Wappinger had the slightest idea that there were, or were supposed to be, any restrictions on building on Parcels B and E. Had a third party not intervened, the O'Mara house would have been completed without incident and no one would have been the wiser.

27. But the matter was of interest to a third party. While the house was under construction, Ronald Lafko noticed it going up. Ronald was the son of the Mr. Lafko who had originally developed Wildwood Manor—and who, with his partner, was told that Lots B and E could not be developed. After Mr. Lafko's death, his estate did not pay the taxes on the two lots, and allowed them to go at tax sale for a relatively nominal sum (under $30,000). I conclude that the heirs of the original owners allowed the land to be lost because they believed, based on the original conditions imposed on Lafko and Alexander and Skyview Development, that the lots were not available for development. For that reason, I infer that Mr. Lafko became quite irate when he observed a house going up on what he knew should have been a vacant lot.

28. In July, 2003, Ronald Lafko approached Wappinger Town Councilman Bettina to express concern over the construction of a house on a lot that was not supposed to be developed. Several weeks later, Lafko provided Mr. Bettina with a copy of the original plat map for Wildwood Acres (PX 3B), showing the "open space" restriction. Mr. Lafko also brought this information to the attention of the Town Superintendent of Highways, Graham Foster.

29. Morello did not immediately approach Donald O'Mara with this information. In fact, he did nothing about it until November 2004, when the house was nearly complete.

30. On November 6, 2003, Susan Dao, Deputy Zoning Administrator of the Town of Wappinger, issued a stop work order on the O'Mara house for wetlands encroachment. (PX 36)

31. On the same day, Ms. Dao issued a second stop work order halting construction until such time as the Town issued a grading permit. (PX 37)

32. On November 11 or 12, at 2 PM, George Kolb, the newly-appointed Building Inspector of the Town of Wappinger, issued a third stop work order (PX 38). This order demanded that O'Mara stop work on the house because of the open space notation on Filed Map 3107 (PX 3B)—the map that Ronald Lakfo had brought to the Town's attention the previous summer.

33. The third stop work order issued despite the fact that Loretta Brunello, Assessor's Aide for the Town, had officially notified Tanya Lukianoff, by letter dated November 10, 2003, that "Dutchess County Real Property" had verified that no conservation easements or restrictions were filed of record on either Parcel B and Parcel E. (PX 39) Kolb claims to have been unaware of this letter. (Trial Tr., 180)

34. Plaintiffs immediately protested the issuance of the third stop work order. He attended a meeting on November 17, 2003 at Town Hall, with the Zoning Administrator and the Building Inspector to try to resolve the matter.

35. After that meeting, the Town permitted some exterior work to be completed on the lot on which the house sat. (PX 40). However, the Town did not remove the stop work order predicated on the restriction on the filed map.

36. Plaintiff Donald O'Mara made an oral request that he be issued a "temporary certificate of occupancy" for the house while the parties attempted to resolve the dispute. At the time, the house was practically complete; O'Mara had already sold his house in Mahopac; and his diabetic son was scheduled to return home after an extended hospital stay. Kolb denied this request. To the extent that Kolb testified that no such request was made, I do not credit Kolb's testimony. To the extent that O'Mara asked for a "temporary certificate of occupancy," he used a term that has a technical definition in the Town Code of Wappinger. However, I conclude that O'Mara's use of the word "temporary" was not intended to comport with the definition found in the Town Code (with which he was not familiar); rather, O'Mara was asking for a certificate of occupancy so that he could move into his house pending resolution of the "open space" issue.

37. On or about December 2, 2003, Albert P. Roberts, Town Attorney for the Town of Wappinger, made a written settlement proposal to Maurice Salem, counsel for plaintiffs, in which the Town offered to grant a certificate of occupancy for the O'Mara house, on a one-half acre lot, provided the rest of Parcels B and E were designated as "open space" as provided on Map 3107. (PX 42) Despite plaintiffs' efforts to characterize this document as extortion and a Fifth Amendment taking, it was and remains nothing more than an initial settlement proposal—albeit one from which the Town was not to budge.

38. Plaintiffs responded by bringing this action (under the now-discredited "Takings" theory), and Donald O'Mara— who needed someplace to live—moved into the all-but-completed house without first obtaining a certificate of occupancy.

39. On or about February 9, 2004, Donald O'Mara was criminally cited for a violation of New York's Criminal Procedure Law § 100.15 for living on the premises illegally.(PX 74) At a hearing on this violation, Judge Wolfson of the Wappinger Justice Court ordered a safety inspection of the house. Kolb did not conduct a full final inspection, but he determined that the house was safe to live in.

40. On or about April 6, 2004, Kolb went to O'Mara's house to try to resolve the dispute between plaintiffs and the Town. O'Mara secretly taped their conversation. During the conversation, Kolb admitted that the Town had made some "errors" and admitted that the map was "stupidly handwritten, never filed correctly." Kolb confessed that the Town was concerned about being sued by the Alexander and Lafko heirs if plaintiffs built houses on the parcels. He threatened that if plaintiffs were granted the right to build on the land by a court, the Town would not permit subdivision of the property (which is not presently subdivided), saying, "Whatever you think you can get out here, you may get out but if it happens at all it will be way down the road. They're not going to stop whether it's going to get a building permit, subdivide or anything," (PX 62A at 4), and, "When you come in to Tanya to apply for subdivision, she is not going to take the applications. So that's going to trigger another lawsuit." (PX 62A at 35) Kolb also told O'Mara that the court system was biased in favor of municipalities, and that other individuals who did not bid on the land at the tax sale would be allowed to come to court and testify that they knew the land was open space. PX 62–A is an altogether entertaining transcript—especially the part in which Kolb predicts that the Town of Wappinger would say, "F—the judge" if it lost the lawsuit (PX 62A at 59)—and it is an accurate transcript based on my review of the tape itself. The tape con-

tradicts in several particulars the trial testimony of Kolb, which is why, whenever there is a credibility issue between Kolb and O'Mara, I find in favor of O'Mara.

41. After this conversation failed to move plaintiffs to accept one house in exchange for letting the Town keep the rest of the land as open space, Kolb cited O'Mara for additional instances of violating CPL § 100.15. Kolb conducted a full safety inspection of the house after issuing this additional citation. He concluded that the house was safe and ready for occupancy and would be entitled to a certificate of occupancy except but for the open space issue. (PX 62B at 20).

42. O'Mara pleaded guilty to six counts of violating CPL § 100.15. Judgment against him was entered on July 24, 2004. He was fined a total of $1500. He pleaded rather than face jail time.

43. Plaintiffs spent between $300,000 and $350,000 to build the house in Wappinger. (Tr. 120). When Donald O'Mara was unable to live in that house, he moved into another house he owned in Mahopac, so he incurred no cost to rent or purchase interim housing.

44. Patrick O'Mara, who is a real estate broker, testified that the fair rental value of a 2800 square foot, four bedroom house in Wappinger is between $2500 and $3000 per month. (Tr. 66). April 2004 through November 2005 is 20 months.

45. O'Mara and Kolb bet a steak dinner on the outcome of this case (PX 62A at 36).

### Conclusions of Law

Kolb owes O'Mara a steak dinner.

*1. Claim for Declaratory Judgment of Ownership Free and Clear of Restriction*

■ Plaintiffs' principal claim is for a judgment declaring that Absolute owns Parcels B and E free and clear of any "open space" restriction or Planning Board resolution that otherwise prohibits the issuance of a building permit on the property. Everything else is subsidiary to this state law claim (and, indeed, I find that the original federal takings claim—which was dismissed months ago—was manufactured to get what is essentially a state law dispute where diversity is lacking into this court).

Plaintiffs are entitled to the declaration they seek, because they do own Parcels B and E free and clear of any "open space" restrictions. They are not bound by either the notation on Filed Map 3107 or the Planning Board resolution of January 23, 1963 because neither of those documents is "of record" as required by New York's Real Property Law.

The requirements for recording an interest in real property are set forth in Real Property Law § 291. That section provides that, unless a "conveyance" of real property within New York State is in writing, executed by the creator or transferor of the interest and signed before a notary public, it is "void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof...in good faith and for a valuable consideration...." There is no dispute that, at the time plaintiffs took title to Parcels B and E, they were unaware of the Planning Board's restriction on developing the land. It is equally undisputed that they paid valuable consideration for the parcels.

Absolute's deed makes it clear that it took title subject only to "existing right of way and easements, and any and all existing restrictions, conditions and covenants of record." (PX 13). The Planning

Board's condition/restriction was not "of record;" so while Lakfo and Alexander (and, presumably, their heirs, although that issue is not before me) could never have built on the parcels in question, plaintiffs can.

■ New York law on this point is simple and straightforward. Where a restriction limiting development does not appear in the owner's chain of title, the restriction is unenforceable against the owner. Because Dutchess County uses a grantor-grantee indexing system, unless the restriction "is executed and recorded in the manner prescribed by statute, such a record is of no avail." *Gray v. Delpho,* 97 Misc. 37, 44, 162 N.Y.S. 194 (1916). The restriction that the Town seeks to enforce against plaintiffs is not in the chain of title, because it is not executed and recorded in the manner prescribed by the Real Property Law.

■ The failure to record any conveyance of real property renders such conveyance void as against any subsequent good faith purchaser who pays valuable consideration and records first. *See Chen v. Geranium Dev. Corp.,* 243 A.D.2d 708, 663 N.Y.S.2d 288 (2d Dept.1997). And the failure to record any restriction on the use of property—including a restriction made in a resolution of a municipality's Planning Board—means the restriction is not enforceable against the bona fide purchaser for value, which the plaintiffs unquestionably are. *See Ioannou v. Southold Town Planning Bd.,* 304 A.D.2d 578, 758 N.Y.S.2d 358 (2d Dept.2003).

*Ioannou* is so closely on point as to be dispositive. In *Ioannou,* a condition not to subdivide a parcel further was imposed on the parcel by a prior owner. *See id.* at

578, 758 N.Y.S.2d 358. The condition was filed with the Planning Board of the Town of Southold, but was not recorded in the County Clerk's Office as required by the Real Property Law. The Appellate Division held that a subsequent purchaser for value was not bound by the condition because filing with the Town Board did not place the restriction in the chain of title. *See id.* at 579, 758 N.Y.S.2d 358.

The facts found above admit of but one conclusion: the Planning Board did indeed restrict the two parcels as open space in 1963. It decreed that no building permit should ever issue as to either parcel. In so doing, the Town appears to have acted pursuant to General Municipal Law § 247, which specifically authorizes municipalities to acquire "interests or rights in real property for the preservation of open spaces and areas...by purchase, gift, grant, bequest, devise, lease or otherwise." Such "interest" may include "the fee or any lesser interest," which lesser interests are defined to include "development right[s], easement[s], covenant[s], or other contractual right[s]." The restriction on Lafko and Alexander's right to develop Parcels B and E falls squarely within what was contemplated by the Legislature when it drafted the General Municipal Law.[2]

But that Law goes on to state that "any interest acquired pursuant to this section is hereby enforceable by and against the original parties and the successors in interest, heirs and assigns of the original parties, *provided that a record of such acquisition is filed in the manner provided by § 291 of the Real Property Law.*" Gen. Mun. L. § 274(4) (Emphasis added). Here, neither the Planning Board minutes showing the restriction nor the approved

2. It matters not that the Planning Board did not specifically cite Gen. Mun. L. 274 as the authority for its actions.

Plat Map with its "open space" notation[3] was ever recorded in accordance with § 291 of New York's Real Property Law. Therefore, the restriction—while validly adopted and enforceable against Lafko and Alexander and anyone else who had notice of the restriction prior to taking title (such as the developers' heirs, I imagine)—is not enforceable against the plaintiffs.

The Town of Wappinger could have rendered the restriction enforceable against all takers in a number of ways. It could have recorded Map 3107 with the Dutchess County Clerk by following the procedures set forth in the Recording Act. Indeed, Real Property Law § 333–b provides that a map (like PX 3B) "may be recorded in the same manner as a deed if the map or plot plan is attached to the conveying instrument." Or the Town could have recorded the January 23, 1963 Planning Board minutes (which state clearly that no building permit was ever to issue for Parcels B and E). Or the Town could have converted the restriction imposed by the Planning Board into a condition or easement and made that document of record. The Town made a mistake in failing to do one of these things. It made that mistake a very long time ago. The present officials of the Town of Wappinger cannot and should not be taxed for this critical error.

But the effect of the mistake is that plaintiffs own Parcels B and E free and clear of any restriction to keep it as open space. So Mr. O'Mara can keep his house, and he can do whatever he likes with the rest of the property, as long as he complies with the Town's Zoning Code. If the land is zoned for, say, half acre development, then he can file a subdivision plan and build houses on half acre lots. And if the Town of Wappinger wants what is left of Parcels B and E to remain as open space, it will have to condemn the land and pay plaintiffs fair value therefor. (I give short shrift to Kolb's suggestion that Town officials would act in an arbitrary manner against plaintiffs by, say, refusing to approve subdivision plans that conformed to the Town's Zoning Code; both sides are well aware that any arbitrary refusal to deal with plaintiffs pursuant to law would result in another lawsuit).

The Town's argument that Real Property Law § 334, which mandates the *filing* (not the recording) of subdivision plat maps by the subdivider (with statutory fines for non-compliance) does not lead to the conclusion that such maps are within the chain of title as long as they are filed with the Town. Real Prop. L. § 334 does not speak of such maps being part of the chain of title; rather, § 334 ensures that proposed subdivisions comply with appropriate rules regarding surveying, taxation, and environmental protection. The mere fact that such documents are within a public record does not mean they are within the chain of title under Gen. Mun. L. § 274. *Ioannou,* cited above, is to the contrary, and is the controlling precedent in this case.

In view of the foregoing, the Town's argument that the Planning Board restriction does not qualify as a "conveyance" within the meaning of Real Prop. L. § 290(3) falls by the wayside.

Nor is the Town's reference to the Court of Appeals' opinion in *Huggins v. Castle*

---

**3.** I reject the testimony of Mr. Lynn, the surveyor, that the notation "open space" on a filed map is somehow unworthy of note. Fortunately for Mr. Lynn, his mistake is of no moment. By the time he performed his survey and encountered Filed Map 3107, his clients had owned Parcels B and E for well over a year. Nothing Lynn saw in September 2002 constituted "actual notice" to plaintiffs, because a bona fide purchase for value must have actual notice of a restriction before he takes title. No harm, no foul.

*Estates, Inc.,* 36 N.Y.2d 427, 369 N.Y.S.2d 80, 330 N.E.2d 48 (1975) of any moment. In fact, it is puzzling, because in *Huggins,* New York's high court reversed an Appellate Division decision upholding a restriction on the development of land, and ruled that a notation to a restrictive zoning rule on a filed plat map did not create a negative easement. The notation did not create an express easement because it failed to satisfy the Statute of Frauds, in that it was not properly subscribed and did not contain all the terms of the alleged agreements or manifest a definite intent to create the alleged restriction. It did not create an implied negative easement either. Prefacing all these holdings was the Court's recognition that, "The policy of the law is to favor the free and unobstructed use of realty." *Huggins,* supra., 36 N.Y.2d at 430, 369 N.Y.S.2d 80, 330 N.E.2d 48. In this case, a ruling in favor of plaintiffs— that is, a ruling that refuses to restrict development of a parcel where a restriction was not properly recorded and so was not seen by plaintiffs prior to taking title— comports with the policy of the law.

Plaintiffs are entitled to and shall have a judgment declaring that they own Parcels B and E free and clear of the "open space" restriction imposed on the parcels by the Town of Wappinger Planning Board in December 1962 and January 1963.

### 2. *Claim Pursuant to 42 U.S.C. § 1983 (Substantive Due Process)*

A Section 1983 claim has two essential elements: (1) the defendant acted under color of state law, and (2) as a result of the defendant's actions, the plaintiff suffered a denial of his or her federal constitutional or statutory rights or privileges. *Annis v. County of Westchester,* 136 F.3d 239, 245 (2d Cir.1998).

■ In this case, plaintiffs seek to impose liability on the municipality itself, not on an individual actor. A municipal corporation may be sued directly under Section 1983 for money, declaratory or injunctive relief where the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision that has been officially adopted and promulgated by the official or officials who, by virtue of state law, have "final authority" over a matter—that is, by an official whose edicts or acts may fairly be said to represent official municipal policy. *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Plaintiffs claim that their substantive due process rights were violated by the Town of Wappinger. Specifically, they allege that they had a constitutionally cognizable property interest—to wit, a "legitimate claim of entitlement"—in the issuance of a certificate of occupancy for Donald O'Mara's house, and that the Town issuance of the stop work order based on the "open space" restriction was wholly without justification. *Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *Sullivan v. Town of Salem,* 805 F.2d 81 (2d Cir.1986).

■ Courts have traditionally recognized that an applicant for a permit has a "legitimate claim of entitlement" when the approving agency's discretion is limited. *Sullivan,* 805 F.2d at 85; *Walz v. Town of Smithtown,* 46 F.3d 162 (2d Cir.1995); *Brady v. Town of Colchester,* 863 F.2d 205 (2d Cir.1988). Courts do not find any "legitimate claim of entitlement" when a municipal board or officer has substantial discretion in issuing a permit or certificate. *See Harlen Assoc's v. Inc. Village of Mineola,* 273 F.3d 494, 504 (2d Cir.2001). However, when an officer has virtually no discretion to withhold a permit, a claim of entitlement exists.

A building inspector has virtually no discretion to withhold a certificate of occupancy if the construction satisfies applicable building and fire codes. *Sullivan*, 805 F.2d at 85; *Garrett v. Holiday Inns, Inc.*, 58 N.Y.2d 253, 263, 460 N.Y.S.2d 774, 447 N.E.2d 717 (1983). The parties do not dispute that Kolb, as Building Inspector, had final authority to issue or deny the certificate of occupancy, and so qualifies as a "final policymaker" for *Pembaur* purposes.

Kolb inspected the house in April 2004 and agreed that he could have issued a certificate of occupancy were it not for the dispute over whether the land on which it sat was subject to the "open space" restriction. (*See* Finding of Fact # 41). I need not determine whether Kolb was justified in refusing to issue a "temporary certificate of occupancy" when O'Mara asked that he do so in November 2003. Clearly, by April 2004, the house was deemed fit for occupancy after inspection. From and after that date, plaintiffs were entitled to a certificate of occupancy, and Kolb had no discretion to withhold it.

Kolb refused to issue the certificate of occupancy only because the house was allegedly built in violation of the "open space" restriction. But that restriction, as I have just found, was not binding on plaintiffs. And the Town knew that plaintiffs were not so bound. Loretta Brunello, Assessor's Aide for the Town, had notified Tanya Lukianoff, by letter dated November 10, 2003, that "Dutchess County Real Property" had verified that no conservation easements or restrictions were filed of record on either Parcel B and Parcel E. (PX 39) While Kolb may not have been aware of this letter when he first issued the stop work order on November 13, 2003, as he testified, I refuse to believe that he was unaware of the letter (or at least the contents of the letter) at the time

he told Donald O'Mara that the house was ready for a certificate of occupancy in April 2004. His tape-recorded admissions to O'Mara that the Town had made errors, and that the map was not properly filed, support the inference that Kolb aware by April that the restriction was not, in fact, of record.

Of course, the Town offered to issue a certificate of occupancy for the house in December 2003—but only if plaintiffs would give up the right to develop the rest of the property. That offer was first conveyed by Attorney Roberts in his December 2003 settlement letter, and was thereafter reconveyed by Kolb in his "unofficial" settlement discussion on April 4, 2004. Unfortunately for the Town, it is patently illegal for a municipality to link the issuance of a permit to a demand that land be conveyed without compensation to the Town. *Walz*, 46 F.3d at 169; *Town of Orangetown v. Magee*, 88 N.Y.2d 41, 643 N.Y.S.2d 21, 665 N.E.2d 1061 (1996).

Because the Town's asserted basis for withholding a certificate of occupancy was illegal, the Town has violated plaintiffs' rights in violation of 42 U.S.C. § 1983. Plaintiffs are entitled to judgment on this claim as well, together with attorneys' fees.

A plaintiff whose constitutional rights are violated is entitled to damages. As noted above, Donald O'Mara did not incur any cost to move into alternative accommodations, because another house he owned was available to him. However, from and after April 2004—the date by which the certificate of occupancy clearly should have issued—plaintiffs lost $2,750 per month in rent for 21 months. They are entitled to damages of $57,750, plus simple interest calculated at the statutory rate for each month's lost rent as it accrued.

### 3. State Law Claims for Fraud and Negligent Misrepresentation

Plaintiff has also raised state law claims for fraud and negligent misrepresentation arising out of the Town's dealings with the O'Maras. Those claims are really alternatives to the claims on which plaintiffs have already succeeded. However, there is no evidence on the record to support either of them.

 "The elements of a cause of action for fraud are a representation concerning a material fact, falsity of that representation, scienter, reliance and damages." *Stuart Silver Assoc., Inc. v. Baco Dev. Corp.*, 245 A.D.2d 96, 98, 665 N.Y.S.2d 415 (1st Dept.1997). "Where a party has the means to discover the true nature of the transaction by the exercise of ordinary intelligence, and fails to make use of those means, he cannot claim justifiable reliance on defendant's misrepresentations." *Id.* at 98–99, 665 N.Y.S.2d 415; *see also Bennett v. Citicorp Mortgage, Inc.*, 8 A.D.3d 1050, 778 N.Y.S.2d 806 (4th Dept. 2004) (applying similar standard to negligent misrepresentation).

 There is no evidence that anyone from the Town encouraged the O'Maras to buy the land by telling them that it was buildable, and if it had, any such statement by the Town was capable of independent verification by the O'Maras through a title search, which they performed. Therefore, the Town was neither fraudulent nor negligent in its representations. And the statements made by the Town that the land was NOT buildable (all of which were made after the issuance of the third stop work order) did not lead to any detrimental reliance by the O'Maras. Those statements were made after plaintiffs acquired the land and built Donald O'Mara's house. Furthermore, the O'Maras did not rely on them—instead, they sued to prove that the statements were wrong, at least as to them.

Therefore, plaintiffs have not made a case for either fraud or negligent misrepresentation against the Town. Those claims are dismissed.

## VERDICT

The plaintiffs shall have judgment against the defendant declaring that they are the owners of Parcels B and E, free and clear of all restrictions that prohibit development of those parcels. (Counts three and four)

Plaintiffs shall have judgment against defendant for the Town's violation of their rights under 42 U.S.C. § 1983. (Count two) Defendants are mandatorily enjoined to issue a certificate of occupancy to Donald O'Mara for the house that he has constructed on a half-acre lot on Parcel B. Defendants are further enjoined from interfering with plaintiffs' use and enjoyment of Parcels B and E, provided plaintiffs are in compliance with the Town Code of the Town of Wappinger. If plaintiffs' counsel believe that a more fulsome form of injunction is necessary, they shall submit a form of order to the court by December 9, 2005.

Plaintiffs shall have judgment against defendant Town in the amount of $57,500, plus interest as aforesaid, for the lost use and occupancy of the Wappinger house. The parties should agree on a calculation of interest.

Plaintiffs shall have judgment against defendant for reasonable attorneys' fees earned by the firm of Bleakley, Platt & Schmidt in connection with the prosecution of the Section 1983 claim (but not the takings claim). Fees are not awardable for the prosecution of state law claims, but of course certain issues related to the declaratory judgment claim had to be re-

solved in order to permit the successful prosecution of the Section 1983 claim, and I can and will award fees attributable to the proof of those matters. The fee application is due on December 16, 2005. I remind counsel that the Section 1983 claim was first asserted in an amended pleading filed last spring.

No fees shall be awarded for the services of Maurice Salem, Esq., either in connection with the prosecution of the original federal "takings" claim or in connection with any work he may have done on the claims asserted in the amended complaint. It is the finding of this court that the takings claim—which was dismissed as non-meritorious some months ago—was in fact frivolous. I decline to award Mr. Salem any fees for his role in prosecuting the declaratory judgment claim; he should have brought that claim in the Dutchess County Supreme Court, instead of manufacturing a non-existent federal claim. As far as this Court is concerned, the Bleakley Platt firm did all the useful legal work in this case.

Defendants shall have judgment of plaintiffs dismissing the claims for fraud and negligent misrepresentation. (Counts Five and Six).